**John Eldon SMITH, or Anthony Isalldo Machetti, Petitioner-Appellant,**

v.

**Charles BALKCOM, Warden, Georgia State Prison, Respondent-Appellee.**

No. 81–7043.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Nov. 2, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96-452—October 14, 1980.

Robert C. Glustrom, John Charles Boger, New York City, Anthony G. Amsterdam, Stanford, Cal., Samuel R. Gross, New Haven, Conn., for petitioner-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before HILL, Circuit Judge, SMITH **, Judge, and HENDERSON Circuit Judge.

JAMES C. HILL, Circuit Judge:

This appeal involves the denial of a petition for writ of habeas corpus made by a Georgia state inmate under sentence of death. Petitioner John Eldon Smith, a/k/a Anthony Isalldo Machetti, was convicted on two counts of murder in the Superior Court of Bibb County, Georgia and on January 30, 1975 was sentenced to die.[1] The Georgia Supreme Court affirmed both his conviction and sentence, *Smith v. State*, 236 Ga. 12, 222 S.E.2d 308, *cert. denied*, 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976), and the United States Supreme Court denied certiorari. *Smith v. Georgia*, 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976). Smith then unsuccessfully petitioned for a writ of habeas corpus in state court, the Georgia Supreme Court affirmed the denial of relief, *Smith v. Hopper*, 240 Ga. 93, 239 S.E.2d 510 (1977), *cert. denied*, 436 U.S. 950, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978), and again the United States Supreme Court denied certiorari. *Smith v. Hopper*, 436 U.S. 950, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978).

Having exhausted his state court remedies, Smith sought a writ of habeas corpus

---

** Judge of the U. S. Court of Claims, sitting by designation.

1. The victims of Smith's crimes were Joseph Ronald Akins and his wife of twenty days, Juanita Knight Akins. Mr. Akins was the ex-husband of Smith's wife, Rebecca Akins Smith Machetti. The murder of Mr. and Mrs. Akins was part of a scheme to secure the proceeds of a life insurance policy on Mr. Akins, and other benefits, the beneficiaries of which were Mrs. Machetti and her three daughters by her marriage to Akins. Smith enlisted the aid of John Maree, who for his participation in the murder scheme was to receive $1,000. Maree and Smith contacted Akins and lured him to the scene of the crime, ostensibly for the purpose of having Akins install a television antenna. On the arrival of Akins and his wife, Smith shot both of them with a shotgun at close range. For additional facts concerning Smith's crime, trial, and conviction, see *Smith v. State*, 236 Ga. 12, 222 S.E.2d 308, *cert. denied*, 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976).

in the United States District Court for the Middle District of Georgia under 28 U.S.C. § 2254. The district judge referred Smith's case to a magistrate, whose proposed findings of fact and conclusions of law were adopted as the opinion of the court. Accordingly, on November 26, 1980, the district court denied the request for a writ. Smith now appeals from that denial. For the reasons set forth below, we affirm the dismissal of Smith's petition.

■ On appeal Smith raises three main issues. First, he contends that the exclusion from the jury, for cause, of two veniremen who were unequivocally opposed to the death penalty violated his rights under the sixth and fourteenth amendments in three distinct respects: (1) exclusion of these veniremen resulted in a jury that was conviction prone and thus less than neutral on the issue of guilt, in violation of his right to trial by an impartial jury; (2) their exclusion violated his right to trial by a jury chosen from a fair cross-section of the com-

munity; and (3) the cumulative effect of such death qualification of jurors infringed his sixth amendment interest in a properly functioning jury. Second, Smith urges that his death sentence was imposed pursuant to an arbitrary and racially discriminatory pattern of capital sentencing in Georgia. Finally, he challenges the constitutional adequacy of Georgia's capital sentencing review procedures.[2]

## I. THE COMPOSITION OF SMITH'S JURY

### A. Right to Trial by an Impartial Jury

During voir dire examination of the jury venire from which the jury that convicted Smith was selected, two persons unambiguously expressed their opposition to the death penalty, indicating that they would automatically vote against imposition of that penalty without regard to evidence presented in the case.[3] These veniremen were excused for cause in accordance with

---

**2.** Before examining the merits of each of the issues raised by petitioner, we must address one contention argued throughout his brief. Smith asserts that the district court erroneously denied him a plenary hearing on the constitutional claims presented in his application for a writ of habeas corpus. First, we note that the district judge expressly stated that he would consider all evidence and authorities offered in support of petitioner's motion for an evidentiary hearing in deciding the merits of the habeas corpus petition. The district judge also allowed the parties thirty days for filing any additional evidence or briefs. Record at 209. Although petitioner contends that at an oral hearing he would have presented new studies never considered by any court with respect to his claims, he does not explain why he was unable to submit these in documentary form to the magistrate during the thirty-day period granted.

Furthermore, although Smith has not relied on 28 U.S.C. § 2254(d), we note that the district court's refusal to hold an evidentiary hearing did not violate that section, which sets forth the circumstances under which a federal district court must hold a hearing on allegations in a habeas corpus petition.

> When ... it affirmatively appears from the petition that a petitioner is not entitled to the writ, an evidentiary hearing is unnecessary .... For example, if a petitioner's habeas corpus allegations raise legal questions only, a district court's refusal to hold an evidentia-

ry hearing does not violate the directives of ... Section 2254(d).

*Spinkellink v. Wainwright*, 578 F.2d 582, 590 (5th Cir. 1978) (citations omitted). Smith raises many of the same contentions raised by the petitioner in *Spinkellink v. Wainwright*. As did the panel in *Spinkellink*, we view these contentions to raise legal questions only and conclude that an evidentiary hearing therefore was not warranted.

**3.** The two veniremen who were excluded were Ulysses G. Mathis and Arlin Henry Dowd. The following excerpt from the trial transcript reveals Mr. Mathis' unequivocal opposition and is almost identical to the colloquy with Mr. Dowd.

Q. Mr. Mathis, are you conscientiously opposed to capital punishment?

A. Yes, I am.

. . . .

Q. Have you already decided that should you be selected on the jury that should you and your fellow jurors find the defendant guilty of the capital offense charged, you would vote against a recommendation of death, without regard to the facts and circumstances that might emerge during the course of this trial?

A. Yes, I would.

Q. You have already made that decision this morning before hearing this case?

A. Yes.

Q. Are you prepared to consider fairly and fully the death penalty as one of the penalties provided by the laws of the State of

the practice approved by the United States Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[4]

Smith contends that the exclusion for cause of these veniremen violated his right under the sixth and fourteenth amendments to an impartial jury.[5] He asserts an argument considered but rejected by the Supreme Court in *Witherspoon*—namely that those veniremen who remain on the

> Georgia as punishment for those found guilty of capital offenses, such as Murder, under certain circumstances and vote to impose the death penalty should the facts and circumstances of this case so warrant?
> A. No, I could not vote to impose the capital punishment.
> Trial Transcript at 65.

4. In *Witherspoon* the Supreme Court held that a sentence of death could not be carried out where the jury that recommended this sentence was chosen by excluding veniremen who voiced *general* objections to the death penalty or expressed conscientious or religious scruples against its infliction. 391 U.S. at 522, 88 S.Ct. at 1777. The Court was careful to note, however, what its holding did not prohibit.

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear ... that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them ....
> *Id.* n.21 (emphasis original).

5. The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ...." U.S.Const. amend. VI. The guarantee of a jury trial in nonpetty criminal cases was first made applicable to the states through the due process clause of the fourteenth amendment in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

6. By death qualification we simply mean the process of determining during voir dire whether a particular venireman is unalterably opposed to capital punishment and would never vote to impose it regardless of the evidence presented or whether he is generally opposed to capital punishment but could subordinate his personal views and apply the law of the jurisdiction in light of the facts of the particular case. The former are excused for cause, while the latter are qualified (as are those not opposed to the death penalty).

jury after the exclusion of those unalterably opposed to the death penalty are more conviction prone than the ones excluded under the "death qualifying"[6] procedure. While Smith does not challenge the exclusion of these unalterably death-opposed veniremen from the panel that determines the penalty to be imposed, he asserts that their being excluded from the guilt determination stage[7] results in the creation of an unconstitutionally conviction-biased jury.

7. Georgia follows a bifurcated procedure in capital cases tried before a jury. If the jury returns a verdict of guilty, the court then conducts a presentence hearing before the jury during which any evidence of aggravating or mitigating circumstances, any prior record of the defendant, and arguments of counsel are presented. Upon conclusion of the evidence and arguments, and following the judge's instructions to the jury, the jury retires to determine the penalty to be imposed. Ga.Code Ann. § 27 2503(b) (1978). In the case of murder the death penalty may not be imposed unless at least one of the statutory aggravating circumstances is found. *Id.* § 27 2534.1(c). If the jury recommends death, it must designate in writing the aggravating circumstance(s) which it found beyond a reasonable doubt. *Id.*

The following are the aggravating circumstances set forth in the statute:

(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

In support of his contention, Smith offers a plethora of studies, some of which were before the Court in *Witherspoon*.[8]

In rejecting this constitutional objection in *Witherspoon*,[9] the Supreme Court stated:

The data adduced by the petitioner . . . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

391 U.S. at 517–18, 88 S.Ct. at 1774–75 (footnote omitted). However, the Court did not foreclose a defendant, having more persuasive evidence of juror tendencies, from asserting the guilt proneness of death-qualified jurors in a subsequent case. Some of the issues that would then arise were suggested.

Even so, a defendant convicted by such a jury in some future case might still

---

(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another. *Id.* § 27 2534.1(b). Smith's jury recommended the death penalty on the basis of finding beyond a reasonable doubt that Smith committed the murder "for the purpose of receiving money or any other thing of value" pursuant to § 27 2534.1(b)(4).

**8.** The studies presented by Smith include: Bronson, *On the Conviction Proneness and Representativeness of the Death Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U.Colo.L.Rev. 1 (1970); Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and the Use of Psychological Data to Raise Presumptions in the Law*, 5 Harv.C.R.-C.L.Rev. 53 (1970); Jurow, *New Data on the Effects of a "Death-Qualified" Jury on the Guilt Determination Process*, 84 Harv.L.Rev. 567 (1971); E. Bronson, The Exclusion of Scrupled Jurors in Capital Cases: The California Evidence on Conviction Proneness and Representativeness (1979) (California State University at Chico, Discussion Paper 79–6); P. Ellsworth & R. Fitzgerald, Due Process v. Crime Control: The Impact of Death Qualification on Jury Attitudes (1979) (unpublished manuscript); P. Ellsworth, C. Cowan & W. Thompson, Juror Attitudes and Conviction Proneness: The Relationship Between Attitudes Toward the Death Penalty and Predisposition to Convict (1979) (unpublished manuscript); P. Ellsworth, J. Harrington, W. Thompson & C. Cowan, The Effects of Capital Punishment Attitudes on Juror Perceptions of Witness Credibility (1979) (unpublished manuscript); P. Ellsworth, W. Thompson & C. Cowan, Death Penalty Attitudes and the Concept of "Reasonable Doubt" (1979) (unpublished manuscript); P. Ellsworth, W. Thompson & C. Cowan, Ellsworth/Thompson/Cowan Conviction-Proneness Study—Post Deliberation Follow-Up Data (1979) (unpublished manuscript); C. Haney, The Biasing Effect of the Death Qualification Process (1979) (unpublished manuscript); Louis Harris & Associates, Inc., Study No. 2016 (1971); T. Smith, A Trend Analysis of Attitudes Toward Capital Punishment 1936–1974, *reprinted in* Studies of Social Change Since 1948 (J. Davis ed.) (National Opinion Research Center Report 127B, Chicago, 1976) (partial summary of various national polls conducted by Louis Harris & Associates, Inc., American Institute for Public Opinion, & National Opinion Research Center from 1953 1978); W. Wilson, Belief in Capital Punishment and Jury Performance (1964) (unpublished manuscript); H. Zeisel, Some Data on Juror Attitudes Toward Capital Punishment (1968) (Monograph Center for Studies in Criminal Justice, University of Chicago Law School). The United States Supreme Court had before it the Goldberg, Wilson & Zeisel studies when it considered and rejected Witherspoon's claim that a death-qualified jury is less than neutral on the issue of guilt. *Witherspoon v. Illinois*, 391 U.S. 510, 517 n.10, 88 S.Ct. 1770, 1774, 20 L.Ed.2d 776 (1968).

**9.** The Court also rejected this argument in a case decided the same day as *Witherspoon*, *Bumper v. North Carolina*, 391 U.S. 543, 545, 88 S.Ct. 1788, 1790, 20 L.Ed.2d 797 (1968).

attempt to establish that the jury was less than neutral with respect to guilt. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment.

*Id.* at 520 n.18, 88 S.Ct. at 1776. Seizing this invitation, Smith argues that the studies he has offered provide the requisite degree of proof.[10]

■ We assume without deciding that Smith's evidence does indeed supply the persuasiveness found lacking by the Supreme Court and by many other courts, both federal and state, since *Witherspoon.*[11] Nevertheless, for reasons to be discussed, we hold that the exclusion for cause from Smith's jury of veniremen so unequivocally opposed to the death penalty that they would not follow the law on the subject did not deny his constitutional right to an impartial jury.

In *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir. 1978), this court rejected the precise contention now urged by Smith.[12] Today we reaffirm the rationale set forth in *Spinkellink.*

> That a death-qualified jury is more likely to convict than a nondeath-qualified jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant.

*Id.* at 594.[13]

All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side of the case. Clearly, the extremes must be eliminated—i. e., those who, in spite of the evidence, would automatically vote to convict

---

10. Smith points to footnote 18 in *Witherspoon* as the basis for his entitlement to an evidentiary hearing in the district court. This passage can hardly be construed as a mandate that district courts hold such a hearing when a hearing is not otherwise statutorily required. In note 2, *supra,* we decided that an evidentiary hearing was not warranted. Furthermore, we note that with respect to the conviction proneness argument, the state court conducted a full and fair hearing before denying Smith's habeas corpus petition. Dr. Faye Goldberg and Hans Zeisel, both authors of studies presented in support of Smith's argument, testified at the state court hearing.

11. *See Spinkellink v. Wainwright,* 578 F.2d 582, 593 96 (5th Cir. 1978); *United States ex rel. Clark v. Fike,* 538 F.2d 750, 762 (7th Cir. 1976); *United States v. Marshall,* 471 F.2d 1051, 1053 (D.C.Cir.1972); *Eli v. Nelson,* 360 F.Supp. 225, 227 (W.D.Cal.1973); *Wingfield v. State,* 231 Ga. 92, 93, 200 S.E.2d 708, 711 (1973); *People v. Connolly,* 55 Ill.2d 421, 428–29, 303 N.E.2d 409, 413 (1973); *State v. Shepherd,* 213 Kan. 498, 516 P.2d 945, 952 (1973); *Commonwealth v. McAlister,* 365 Mass. 454, 313 N.E.2d 113, 118 (1974); *Fowler v. State,* 512 P.2d 238, 245–46 (Okl.Cr.1973); *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975); *Hunter v. State,* 496 S.W.2d 900, 902 (Tenn.1972); *State v. Trevino,* 10 Wash.App. 89, 92–94, 516 P.2d 779, 782-83 (1973).

12. Smith attempts to persuade us that *Spinkellink* is not controlling in light of new studies that were not available to this court at the time *Spinkellink* was decided. Any significant improvement in the scientific exactitude or conclusiveness of the proof of guilt proneness, however, is irrelevant with respect to the precedential value of *Spinkellink* because, as in this opinion, the court assumed that Spinkellink's contention regarding guilt proneness was factually true. 578 F.2d at 590.

13. Smith argues that this passage reveals the assumption which is central to *Spinkellink's* rejection of the conviction proneness claim-*viz.,* that there is no ascertainable standard for determining jury impartiality. Brief for Petitioner-Appellant at 33. He further asserts that this assumption is clearly erroneous in light of new studies that correlate juror attitudes toward the death penalty with tendency to favor the prosecution. We remain unpersuaded. Although the new studies may give us an external, ascertainable standard for determining death-qualified jurors' tendency to convict, they do not give us a standard for measuring impartiality *per se.* Moreover, we cannot expect to achieve the abstract concept of impartiality if it be equated with absence of tendency.

or impose the death penalty or automatically vote to acquit or impose a life sentence. The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury *least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment. Yet Smith here urges that he has a constitutional right to a jury *more* likely than a death-qualified jury to find him innocent.

In essence, Smith urges us to define "impartial" as a middle ground that involves a jury with persons who are in effect defendant prone.[14] The logical converse of the proposition that death-qualified jurors are conviction prone is that nondeath-qualified jurors are acquittal prone, not that they are neutral. Smith offers no proof that inclusion of veniremen currently excludable under *Witherspoon* will not tip the balance in the guilt/innocence determination in favor of the accused.[15] The state as well as the accused enjoys a right to an impartial jury. *See Hayes v. Missouri*, 120 U.S. 68, 70–71, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887); *Williams v. Wainwright*, 427 F.2d 921, 923 (5th Cir. 1970), *modified*, 408 U.S. 941, 92 S.Ct. 2864, 33 L.Ed.2d 765 (1972). Such a tilt of the scales of justice would violate that right. As recognized in *Spinkellink*, the danger of a defendant prone jury is too great to accede to Smith's claim.

> The state has decided that the parties' right under the Sixth and Fourteenth Amendments to an impartial jury and the state's interest in the just and even-handed application of its laws, including [the state's] death penalty, are too fundamental to risk a defendant-prone jury from the inclusion of such veniremen. The Constitution does not prohibit this judgment.

578 F.2d at 596.[16]

## B. Destruction of the Whimsical Doubt

While we reject Smith's argument that conviction by a death-qualified jury violates

---

14. An impartial jury, he contends, is one composed of persons who can fairly and impartially determine the defendant's guilt *without reference to their opinions on the death penalty.* Brief for Petitioner-Appellant at 34. Thus he proposes that there should be no death qualification of veniremen prior to the guilt determination stage. This proposal reveals a paradox, however; for the very premise of Smith's contention that death-qualified jurors are conviction prone maintains that attitudes toward the death penalty influence the guilt/innocence determination. Therefore, there exists the risk that a jury that has not been death-qualified contains many persons who are acquittal or defendant prone because of their opposition to the death penalty. Abstaining from inquiries as to the opinions of veniremen does not insure that the jury will be composed of persons having no opinion.

While propounding the evils of the process of death qualification, Smith also concedes that those veniremen who would automatically recommend the death penalty are properly excludable. Thus, Smith seeks the best of both worlds: he urges that persons unalterably opposed to capital punishment be included on juries at the guilt determination stage and that persons unequivocally committed to imposing the death penalty be excluded. The resulting jury is composed of persons who are neutral with respect to the death penalty, those who theoretically favor or oppose the death penalty but would subordinate these views in applying the law to the evidence, and those who are unalterably opposed to the death penalty. Clearly, the balance of opinion on a jury so composed is in the accused's favor. We refuse to accept Smith's notion of "impartiality."

15. It will readily be seen that this "balanced" jury, which the defendant envisages, is in reality a "partisan jury": if, as he urges, it may include jurors with bias or scruples against capital punishment it must—if it is to have "balance"—include also those with bias in favor of the death penalty as the punishment for murder.
*United States v. Puff*, 211 F.2d 171, 185 (2d Cir.), *cert. denied*, 347 U.S. 963, 74 S.Ct. 713, 98 L.Ed. 1106 (1954).

16. We feel compelled to add that a challenge to the exclusion of death-opposed jurors is a challenge to the state's right to have jurors capable of obeying the court's instructions and of applying the law to all of the issues in the case.

It is highly probable that a survey would disclose that there is a statistically significant number of potential jurors who disagree with the rule that the state must prove guilt beyond

580

his right to an impartial jury, we are fully cognizant that, with regard to the guarantee of impartiality, there are strong competing interests on both sides. As the Supreme Court indicated in dicta in *Witherspoon*, the question is one of accommodation. The Court stated that, even if a defendant proved that the jury which convicted him was less than neutral,[17] the issue would then become "whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence." *Witherspoon v. Illinois*, 391 U.S. at 520 n.18, 88 S.Ct. at 1776. Thus the Court characterizes the dilemma as a problem of remedy and invites consideration of a remedy which, while accommodating the state's interest in submitting the penalty issue to a jury capable of voting for death may be less restrictive of the defendant's interests than is the current scheme.

■ With this "less restrictive alternative" approach in mind, the Supreme Court suggested,[18] and petitioner Smith urged at oral argument, the use of a bifurcated trial, with one jury to determine guilt and another to fix punishment.[19] This court is not

persuaded, however, that this procedure would in fact be less restrictive of the capital defendant's interests.[20] Indeed our fear is that, were we to sanction such a remedy as an appropriate balance of constitutional rights, we would deprive the capital defendant of important benefits which the current system affords him.[21]

As capital trials are currently conducted in Georgia, the same jury sits at both the guilt and penalty phase.[22] There is a potential benefit to a defendant inherent in such a procedure which would be lost were the jury which found guilt discharged and a new jury empanelled to decide punishment. We cannot point to any empirical data in this record demonstrating such a benefit, but we ought not ignore reality.

The fact that jurors have determined guilt beyond a reasonable doubt does not necessarily mean that no juror entertained *any* doubt whatsoever. There may be no *reasonable* doubt—doubt based upon reason—and yet some *genuine* doubt exists. It may reflect a mere possibility; it may be but the whimsy of one juror or several. Yet this whimsical doubt—this absence of absolute certainty—can be real.

a reasonable doubt and that such people are more readily persuaded by the prosecutor than are others. Nevertheless it does not follow that the state would be entitled to have on the panel any such potential jurors even though they confess that they would be unwilling to accept and apply this important rule. All parties are entitled to the exclusion of those whose feelings are so intense that they would be unwilling to obey the law if it be perceived as contrary to their tendencies.

17. A serious defect in petitioner Smith's argument that his conviction must be reversed is his failure to bridge the gap of proof between the abstract proposition that death-qualified jurors are conviction prone and the contention that the jury which convicted him was in fact less than neutral with respect to guilt.

18. The Court emphasized that this alternative was *only* a suggestion, stating it intimated no view regarding the proper resolution of this problem. 391 U.S. at 520 n.18, 88 S.Ct. at 1776.

19. *Id.*

20. Our reservations on this point are in addition to our refusal, as discussed above, to consider a jury which includes persons with unalterable opposition to the death penalty an "impartial" jury. Thus the bifurcated procedure cannot overcome the risk of violating the state's right to an impartial jury inherent in a nondeath-qualified jury which may be defendant prone, since a bifurcated procedure envisions a jury at the guilt determination stage which is composed as Smith urges.

21. More specifically, we fear that in his zeal to correct what he perceives to be a constitutional deficiency in the guilt phase, the defendant has viewed the problem with tunnel vision, ignoring the detriment which the proposed remedy entails. Although petitioner objects only to the exclusion at the guilt phase of veniremen opposed to the death penalty and not to their exclusion at the penalty phase, we must examine, having due regard for the protection of the defendant's rights, the consequences of any remedy which he asks this court to sanction.

22. Ga.Code Ann. § 27 2503(b) (1978).

The capital defendant whose guilt seems abundantly demonstrated may be neither obstructing justice nor engaged in an exercise in futility when his counsel mounts a vigorous defense on the merits. It may be proffered in the slight hope of unanticipated success; it might seek to persuade one or more to prevent unanimity for conviction; it is more likely to produce only whimsical doubt. Even the latter serves the defendant, for the juror entertaining doubt which does not rise to reasonable doubt can be expected to resist those who would impose the irremedial penalty of death.

Under Georgia's present procedure, such a juror would sit to decide punishment. The right to have that juror—or those jurors—, entertaining whimsical doubt, on the penalty jury is of undoubted value to the defendant.

The scheme appellant here urges upon us would effectively destroy the whimsical doubt. The guilt-determining jurors—including those not absolutely certain—would be thanked for their service and discharged. A new jury, including only those willing to impose the death penalty, would be selected. They would entertain no doubt that the defendant before them was, indeed, the guilty party. Presumably they would be instructed that the defendant was the guilty party. They would hear only evidence of aggravating circumstances surrounding the commission of the crime—and mitigation if there be evidence of such. Not even a flimsy alibi would disturb their deliberations; no suggestion of misidentification would be material. Certainty of guilt would replace any whimsical doubt entertained by the discharged jurors. Some may conclude that the destruction of the whimsical doubt, sought here by appellant, would involve a more serious deprivation of the benefits of the constitutionally guaranteed jury trial than envisioned by Smith's advocates in this appeal.[23] In short, Smith has not persuaded us that the remedy he has suggested is a better accommodation of the state's and the defendant's interests than is the present system.[24]

That there is no record in this case evaluating the impact of the two-jury system upon important interests of the defendant further illustrates the shortcomings of appellant's case. A compilation of data from experience or experiment might show the relative likelihood of the imposition of the

23. We have not overlooked the argument that the influence of such whimsical doubt at the penalty phase is likely to be minimal in light of the highly structured procedure for penalty determination in a capital case. See note 7, *supra*, discussing the Georgia statutory scheme. Although the jury is instructed to find on the basis of the evidence the presence or absence of mitigating circumstances or statutory aggravating circumstances, we cannot conclude that compromise does not play a role in the jury's deliberations. *See Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932). The statutory scheme for capital sentencing is designed to channel the jury's discretion, not to eliminate all interaction among the jurors in which one juror attempts to convince others, based perhaps only upon the presence of whimsical doubt, to vote against the death penalty. Moreover, Georgia's statute expressly permits the jury to recommend mercy. Ga. Code Ann. § 27 2503(b) (1978). Whimsical doubt, therefore, may play an important role.

24. Of course, other possibilities remain. One alternative might involve death qualification of *all* potential jurors for an entire term of court on the first day of the term. The responses of all potential jurors to questions concerning their ability to fairly decide guilt or innocence and to apply the death penalty would be recorded and filed. When a capital case arose on the calendar and a venire was selected, attorneys for both prosecution and defense could exercise their challenges for cause by reference to the juror's prior responses. This procedure would eliminate the necessity of death qualification during voir dire and thereby avoid the guilt proneness taint which, according to the data presented by Smith, results from the very process of such questioning just prior to actual trial. See C. Haney, The Biasing Effects of the Death Qualification Process (1979) (unpublished manuscript).

We do not suggest that this alternative is any more satisfactory than those offered by Smith. Any opinion regarding its constitutional acceptability must await proper presentation and argument before this or another court. We simply offer it by way of illustration that the problem of remedy (and we reiterate the view expressed in note 20 and in text, supra, that we do not concede that there is a constitutional problem in the present system) is a difficult one that has yet to be thoroughly explored.

death penalty by jurors directed to accept the guilt of defendant and by jurors who have heard and considered defendants' attacks upon prosecutors' fact cases. Absent such data, mere proof of the coincidence of exclusions for cause and elimination of tendencies of excused veniremen is but a fragment of the whole picture.

What we have written here is not based upon a review of the record in this case. We merely presume to some understanding of the place of a jury in our system for the administration of justice. That role is, in the end, "the interposition between the accused and his accuser of the commonsense judgment of a group of laymen" spoken of in *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446 (1970).

### C. Right to a Jury Chosen from a Fair Cross-Section of the Community

██ Smith also argues that the exclusion for cause of veniremen opposed to the death penalty infringed his right under the sixth and fourteenth amendments to a jury which is representative of the community. *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975), clearly establishes that the "venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." In reliance on *Taylor*, Smith urges that death-opposed jurors comprise a distinctive group whose systematic exclusion violates the sixth amendment. Although the fair cross-section requirement does not mean that the jury actually chosen must mirror the community and reflect the various distinctive groups in the population, id.,[25] the Supreme Court's opinions concerning the jury trial guarantee do intimate that this sixth amendment right comprehends a *fair possibility* for obtaining a jury which is representative of the community. *See Peters v. Kiff*, 407 U.S. 493, 500, 92 S.Ct. 2163, 2167, 33 L.Ed.2d 83 (1972); *Wil-*

*liams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 466 (1970). The exclusion of veniremen unalterably opposed to the death penalty undoubtedly reduces the possibility of obtaining a jury which represents a true cross-section of the community. Any elimination of prospective jurors who are disqualified potentially impairs the achievement of a true cross-section on the particular jury. Nevertheless it must be remembered that a jury which reflects a fair cross-section of the community is a goal that is never to be achieved at the cost of leaving on the jury those veniremen who are legitimately disqualified. As the Supreme Court has observed, "The fair cross section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury list or panels are representative of the community." 419 U.S. at 537–38, 95 S.Ct. at 701.

██ One would not suppose, for example, that defendant Jones who was on trial for murder in Jones County, 85% of which is populated by members of the Jones family, is entitled to a jury on which members of the Jones family serve, even though a jury from which Jones family members are excluded would not reflect a fair cross-section of the community. Thus, relationship to the defendant is a legitimate disqualification even though, in our hypothetical, such exclusion negates *any* possibility of obtaining a jury which is representative of the particular community. Likewise, unalterable opposition to capital punishment is a legitimate disqualification even though it reduces the possibility of achieving a true cross-section on the particular jury. As stated by the Supreme Court, even if the defendant establishes a prima facie viola-

---

**25.** In *Taylor* the Supreme Court carefully noted the limits of its holding: "Defendants are not entitled to a jury of any particular composition." 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975) (citations omitted). Accordingly, to the extent that Smith's argument is based on the misconception that the sixth amendment guarantees that his particular jury must have a number of death-opposed jurors which is reasonably reflective of the number of such persons in the community, we reject his argument.

tion of the fair cross-section requirement,[26] the state may justify the infringement by proof of "a significant State interest [which is] manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of the distinctive group." *Duren v. Missouri*, 439 U.S. 357, 367–68, 99 S.Ct. 664, 670, 58 L.Ed.2d 579 (1979) (footnote omitted). "[T]he parties' right under the sixth and fourteenth amendments to an impartial jury and the state's interest in the just and evenhanded application of its laws" supply the necessary justification. *Spinkellink v. Wainwright*, 578 F.2d 582, 597 (5th Cir. 1978). For these reasons, we hold that unalterable opposition to the death penalty is a legitimate disqualification and that the exclusion of such disqualified jurors does not violate the fair cross-section principle of the sixth amendment. The fair cross-section must, in the end, be fair. Neither the state nor the defendant is entitled to an unfair juror whose interests, biases or prejudices will determine his or her resolution of the issues regardless of the law and regardless of the facts. A cross-section of the fair and impartial is more desirable than a fair cross-section of the prejudiced and biased.

## D. Right to a Properly Functioning Jury

Relying on *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), Smith argues that the process of death qualification has the same damaging effects condemned as a violation of sixth and fourteenth amendment interests in *Ballew*. In that case the Supreme Court concluded that a state criminal trial to a jury of only five persons deprived the accused of the jury trial right guaranteed by the sixth and fourteenth amendments. The Court's conclusion rested on empirical evidence suggesting that the smaller size of the jury had detrimental effects on group deliberation, on the accuracy and consistency of results, and on the representation of minority viewpoints in jury decisionmaking. *Id.* at 232–38, 98 S.Ct. at 1035–38. By analogy Smith contends that death qualification is unconstitutional because it limits the attitudinal perspectives represented on the jury, thereby inhibiting the counterbalancing of biases during the deliberative process,[27] and excludes a significant minority viewpoint.[28]

**26.** We do not mean to imply that the evidence presented by Smith sets forth a prima facie violation.

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). According to Smith, the complete exclusion from the jury of veniremen opposed to capital punishment, as *Witherspoon* permits, conclusively establishes elements (2) and (3). These two elements, however, deal with the representation of a particular group in *venires*, not in actual juries. Smith has not alleged or offered to prove that the venire from which his jury was selected did not contain a number of death-opposed veniremen which was fair and reasonable in relation to the number of such persons in the community. Furthermore, we do not decide that veniremen excludable under *Witherspoon* comprise a "distinctive" group. Compare *Spinkellink v. Wainwright*, 578 F.2d 582, 597 (5th Cir. 1978) (wherein court assumed arguendo the "distinctiveness" of this group).

**27.** Incidentally, we observe that the Court's concern in *Ballew* with the less frequent occurrence of hung juries as jury size diminishes, 435 U.S. at 236, 98 S.Ct. at 1037, is parallel to the concern expressed above with the bifurcated trial procedure suggested by Smith. The detriment in both instances is to the defendant.

**28.** Studies presented by petitioner Smith suggest that blacks and women are disproportionately excluded through death qualification. *See* Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and the Use of Psychological Data to Raise Presumptions in the Law*, 5 Harv.C.R.-C.L.Rev. 53 (1970); P. Ellsworth & R. Fitzgerald, Due Process v. Crime Control: The Impact of Death—Qualification on Jury Attitudes (1979) (unpublished manuscript); Louis Harris & Associates, Inc., Study No. 2016 (1971); T. Smith, A Trend Analysis of Attitudes Toward Capital Punishment 1936 1974, *reprinted in* Studies of Social Change Since 1948 (J. Davis ed.) (National

Smith's analogy to *Ballew* is inappropriate. The Supreme Court's concern in *Ballew* focused on the effect of *size* on the proper functioning of the jury. The Court's task was that of simply drawing a line, of setting a constitutional minimum for the size of juries in nonpetty criminal cases. *See Ballew v. Georgia*, 435 U.S. at 245–46, 98 S.Ct. at 1041–42. (Powell, J., concurring) ("[T]he line between five- and six-member juries is difficult to justify, but a line has to be drawn somewhere if the substance of jury trial is to be preserved."). Thus the Court limited its focus to this question. It did not purport to establish, as Smith would have us accept, a sweeping constitutional rule stating that factors which, considered individually, do not infringe an accused's sixth and fourteenth amendment rights may effect, when viewed in the aggregate, a violation of those rights. The Court in *Ballew* was not inviting defendants to allege as many "negative" factors as possible with the hope of reaching the threshold level for a sixth amendment violation. Moreover, the analogy to *Ballew* is faulty because Smith is concerned with the particular attitudinal composition of the jury and seeks to require the inclusion of a particular viewpoint—i.e., the view of those irrevocably opposed to the death penalty—on any jury that determines his guilt or innocence. So phrased, Smith's argument manifests itself as simply another way of claiming that the jury which convicted him was not fairly representative of the community. We have considered and rejected this claim above.[29]

Having examined each aspect of Smith's constitutional attack on the exclusion of veniremen irrevocably opposed to the death penalty, we conclude that Smith's jury was constitutionally composed. We are not prepared to nullify *Witherspoon* by holding that the death qualification process approved therein violates the defendant's rights under the sixth and fourteenth amendments.

## II. ARBITRARY & CAPRICIOUS IMPOSITION OF DEATH PENALTY

Smith next contends that his sentence was imposed pursuant to a pattern and practice of wholly arbitrary and capricious infliction of the Georgia death penalty in violation of the eighth and fourteenth amendments. The district court properly found *Spinkellink* controlling on this issue.[30]

In *Spinkellink* this court observed "that if a state follows a properly drawn statute in imposing the death penalty, then the arbitrariness and capriciousness—and therefore the racial discrimination—condemned in *Furman* [*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346] have been conclusively removed." *Spinkellink v. Wainwright*, 578 F.2d 582, 613–14 (5th Cir. 1978) (footnotes omitted). Smith construes *Spinkellink* as precluding constitutional challenges to the *application* of a death penalty statute and argues that *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980),[31] overrules *Spinkellink*

Opinion Research Center Report 127B, Chicago, 1976) (partial summary of various national polls conducted from 1953 through 1978 by Louis Harris & Associates, Inc., American Institute for Public Opinion, & National Opinion Research Center).

**29.** To the extent *Ballew* exhibits some concern with the presence of minority viewpoint, we observe, as did the Supreme Court, that this point overlaps the question of jury representativeness. 435 U.S. at 236 37, 98 S.Ct. at 1037. As we discussed above, we are aware of no precedent that grants the accused a constitutional entitlement to the representation of specific viewpoints on his particular jury as long as the accused has a fair chance of obtaining a

jury that reasonably reflects a cross-section of the community.

**30.** The allegation in Smith's brief tracks the language used by the petitioner in *Spinkellink* —viz., that the death penalty is "being exacted pursuant to a pattern and practice of Georgia prosecuting authorities, courts, juries and Governors to discriminate on grounds of race, sex and poverty in the administration of capital punishment." Brief for Petitioner-Appellant at 39. Compare *Spinkellink v. Wainwright*, 578 F.2d 582, 616 n.42 (5th Cir. 1978).

**31.** In *Godfrey* the Supreme Court held that the Georgia Supreme Court, in exercising its statutory duty to review capital cases in which the death penalty was imposed, adopted such a

on this point. *Spinkellink*, however, effected no such broad prohibition. It merely established that in the absence of proof of "some specific act or acts evidencing intentional or purposeful . . . discrimination *against [the petitioner]*" on the basis of race, sex, or wealth, a petitioner is not entitled to relief on habeas corpus. 578 F.2d at 614 n.40 (emphasis added).[32] As in *Spinkellink*, we find Smith's claim brimming with "[m]ere conclusory allegations" of discrimination, *id.*, and wanting in proof of intentional discrimination against him in this particular case.

The equal protection aspect of Smith's attack on the constitutionality of the application of Georgia's death penalty suffers from a similar deficiency. Smith has adduced evidence that "racial factors [are] evident in Georgia capital sentencing patterns." Brief for Petitioner-Appellant at 40. Even if this evidence were sufficient to prove a racially disproportionate impact—and we do not decide that it is—such evidence alone cannot establish an equal protection violation. To trigger strict scrutiny of a statute, proof of intentional or purposeful discrimination is necessary. *Washington v. Davis*, 426 U.S. 229, 265, 96 S.Ct. 2040, 2059, 48 L.Ed.2d 597 (1976); *Spinkellink v. Wainwright*, 578 F.2d 582, 615 (5th Cir. 1978). Without such proof,[33] any discriminatory impact may be explained on nonracial grounds. *Spinkellink v. Wainwright*, 578 F.2d at 615. As we have already observed, the state has a legitimate interest in prescribing relevant qualifications for jurors to protect against jurors with pro-defendant biases. Having failed to prove a racially discriminatory intent or purpose in the application of Georgia's death penalty, Smith has not established a violation of the equal protection clause of the fourteenth amendment.

## III. GEORGIA'S CAPITAL SENTENCING REVIEW PROCEDURES

Smith's final complaint centers on the constitutional adequacy of Georgia's capital sentencing review procedures. On review of a case in which the death penalty is imposed, the Georgia Supreme Court is charged with determining:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether . . . the evidence supports the jury's . . . finding of a statutory aggravating circumstance ∴ . . , and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Ga.Code Ann. § 27–2537(c) (1978). Georgia's statutory scheme for the imposition of the death penalty, including this provision for expedited appellate review by the Georgia Supreme Court, was held to be constitutional on its face by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell & Stevens, JJ.). Smith contends that the approval in *Gregg* was conditioned on the Court's assumption about the procedural protections afforded by appellate review and that this assumption has proven to be unfounded. In support of this claim, he relies on a study purporting to show that the methods used by the Georgia Supreme Court to evaluate excessiveness and disproportionality are scientifically unsound and have exaggerated, not reduced, the racial and geographic disparities present in capital sen-

---

broad and vague construction of the aggravating circumstance set forth in Georgia Code Annotated § 27 2534.1(b)(7) (1978) as to violate the eighth and fourteenth amendments.

**32.** Indeed, three times the court took great pains to point out that its rejection of Spenkelink's claim that his death sentence was arbitrarily and capriciously imposed did not preclude as applied attacks on the death penalty

statute. 578 F.2d at 606 n.28, 614 n.40, 616 n.42.

**33.** Smith argues that he was prepared to present this proof at a full evidentiary hearing and should have been given the opportunity to do so. Again, he does not explain why this evidence was not submitted in documentary form during the thirty-day extension. See note 2 *supra*.

tencing. We cannot conclude, as the district court apparently could not,[34] on the basis of this evidence that the Georgia Supreme Court is "incapable of performing its task adequately in all cases." *Gregg v. Georgia*, 428 U.S. 153, 224, 96 S.Ct. 2909, 2949, 49 L.Ed.2d 859 (White, J., concurring). Nor has Smith "even attempted to establish that the Georgia Supreme Court failed properly to perform its task *in this case.*" *Id.* (emphasis added).

To the contrary, the Georgia Supreme Court followed the statutory mandate imposed by § 27–2537(c). It determined that the sentence was not imposed under the influence of passion, prejudice, or other arbitrary factors and, after carefully reviewing the evidence, concluded that the evidence supported the jury's finding that Smith committed the murders for the purpose of receiving money or other things of monetary value, the statutory aggravating circumstance set forth in § 27–2534.1(b)(4). *Smith v. State*, 236 Ga. 12, 24, 222 S.E.2d 308, 317–18, *cert. denied*, 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976). As part of its comparative sentence review, the court also found that the sentence of death in this case was not excessive or disproportionate to the penalties in similar cases, expressly noting the pattern it discerned in the imposition of the death penalty in multiple murder cases. *Id.* at 24–25, 222 S.E.2d at 318. We therefore reject Smith's contention that Georgia's appellate review procedure in capital cases is constitutionally defective and that it operated ineffectively in this case.

AFFIRMED.

---

**34.** Smith objects that the district court failed to address this issue separately and summarily dismissed it. Although we do not commend a district court's failure expressly to confront substantial issues raised in a habeas petition, it is clear that the trial court found Smith's evidence uncompelling. In any event, Smith's claim is for related reasons without merit.

* Former Fifth Circuit case, Section 9(1) of Public Law 96-452—October 14, 1980.