DOUCET, Judge.
This appeal results from the conviction of Carey Lasseigne for first degree murder. During the early morning hours of April 15, 1981, the defendant drove to the Hungry Hobo Restaurant and Gas Station in Henderson, Louisiana. The attendant on duty was 18 year old Russ Landry. The defendant put gasoline in his car then claimed he had no money with him. Russ *1099 allowed the defendant to telephone someone to bring him money to pay his bill. The defendant only pretended to make the call. When Russ’s attention was diverted to his regular chores, the defendant, armed with a .22 caliber pistol, opened the cash register and took approximately $250.00 in cash.
As Russ unwittingly approached the cash register, the defendant, afraid his theft would be discovered, struck Russ on the head with his pistol. The blow to the head did not knock Russ out. Apparently panicked by the turn of events, the defendant forced Russ at gun point to walk to the back of the station. By the defendant’s own admission, Russ pleaded repeatedly with him not to shoot him. As the two approached the rear of the station, the defendant forced Russ to kneel down. The defendant shot Russ in the head from behind. As Russ was falling, the defendant again shot him in the head. Russ fell slumped over a tire, and died a short time later as a result of the bullet wounds.
The defendant later led the police to the murder weapon. Ballistic tests of the gun revealed that at least one of the bullets recovered from the victim was fired from this gun. In addition, after a series of confessions, the defendant reenacted the murder at the scene of the crime on video tape.
The defendant was charged by a St. Martin Parish Grand Jury with first degree murder, a violation of La.R.S. 14:30. The defendant entered a plea of not guilty and not guilty by reason of insanity. On the date fixed for trial, the defendant changed his plea to not guilty.
After the jury was impaneled, the defendant moved for a mistrial, which was denied. The defendant took writs to the Supreme Court urging that the motion should have been granted as the jury was not representative of a cross section of the community. The Supreme Court denied the writ.
The jury returned a unanimous verdict of guilty of first degree murder. Following a sentencing hearing, the jury recommended that defendant be sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. Defendant was sentenced accordingly on April 22, 1982. The defendant appeals his conviction.
Assignments of Error 1, 2, 5-10, 31, 33 and 35 were neither briefed nor argued by the defendant and are considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982); State v. Crawford, 441 So.2d 813 (La.App. 3rd Cir.1983).
In his remaining assignments of error, the defendant addresses the composition of the jury; the propriety of allowing the state to impeach its own witness, Earline Lasseigne; and the propriety of permitting the state to introduce evidence of a prior arrest.
JURY COMPOSITION:
Defendant argues that the trial court erred: (1) in allowing the state to question jurors concerning their ability to apply the death penalty; (2) in excusing 20 jurors due to their sentiments regarding the death penalty in response to the state’s challenges for cause under La.C.Cr.P. art. 798(2); (3) in denying defendant’s motion for a mistrial based on the “death prone” composition of the jury; and (4) in denying defendant’s motion for a new trial based on the composition of the jury.
In short, the defendant complains that he was tried by a “conviction prone jury” which did not represent a fair cross section of the community thus violating defendant’s constitutional right to trial by a fair and impartial jury.
La.C.Cr.P. art. 798(2) provides:
“It is good cause for challenge on the part of the state, but not on the part of the defendant, that:

(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without *1100 regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant’s guilt; ...”
The courts of this state have repeatedly upheld the validity of the exclusion of jurors properly challenged under La.C.Cr.P. art. 798(2). See, State v. Berry, 391 So.2d 406 (La.1980); State v. Williams, 392 So.2d 619 (La.1980); State v. Brown, 414 So.2d 689 (La.1982).
The U.S. Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), dealt with the issue of jurors opposed to the death penalty. The court held that the right of a defendant under the Sixth and Fourteenth Amendments to an impartial jury prevents a state from carrying out a death sentence where “the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.” The court clarified its position by saying in a footnote to that decision that:
“... nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt. Nor does the decision in this case affect the validity of any sentence other than one of death. Nor, finally, does today’s holding render invalid the conviction, as oppose to the sentence, in this or any other case.”
In the case presently before this court, each juror excluded under La.C.Cr.P. art. 798(2) admitted under oath that he or she could not abide by the provisions of the law. Each admitted that his personal bias concerning the death penalty would automatically and completely override his duty to follow the law as instructed and render him unable to honestly take the oath as a juror. Therefore each clearly ranks among those excludable under With-erspoon, supra.
As for jurors Darby, Robin, Boyer, and Berard, in addition to being opposed to imposing the death penalty in this particular case, each admitted some personal connection to the defendant, the victim, or their families, which relationship made it impossible for them to be impartial jurors. For example, juror Howard Boyer testified on voir dire that he knew the defendant’s mother and uncle. Boyer was asked:
“Q. Would it be fair to say that regardless of the evidence put on in this case because of your friendship with the family that you simply could not return the death penalty in this case?
A. Yes.
Q. Would it also be fair to say that as a result of your friendship you simply could not be impartial in this case?
A. Yes, sir.”
Thus, it seems clear that these jurors would be excludable under the Wither-spoon decision. Even if the state’s challenge for cause as to these jurors’ was in error under La.C.Cr.P. art. 798(2), the challenges were well-founded under art. 797. In addition, as to all jurors challenged in this case, the provisions of La.C.Cr.P. art. 797 seem particularly applicable:
“The state or the defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality ...
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
*1101 (4) The juror will not accept the law as given to him by the court; ...” La.C. Cr.P. art. 797, (Emphasis added).
The defendant in this case, however, asserts an issue which the Supreme Court in Witherspoon v. Illinois declined to address. That is the question of whether the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt, thereby substantially increasing the risk of conviction and denying the defendant his right to an impartial jury. Witherspoon v. Illinois, supra. The court, however, left the door open for the adjudication of this issue at footnote 18 of its decision in Witherspoon:
“18. Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to guilt. If he were to succeed in that effort, the question would then arise whether the State’s interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant’s interest in a completely fair determination of guilt or innocence — given the possibility of accomodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution.”
The defendant asserts that the psychological studies and expert testimony he offers establish that a death-qualified jury is more likely to convict than a nondeath-qual-ified jury. He argues that this bias in favor of the prosecution deprives him of his right to an impartial jury.
Assuming for the sake of argument that defendant’s evidence does establish the conviction prone nature of death qualified jurors, we cannot agree that this denies the defendant his right to an impartial jury. In Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), the U.S. Fifth Circuit Court of Appeals rejected the same contention in the following language:
“... That a death-qualified jury is more likely to convict than a nondeath-quali-fied jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant.”
The Fifth Circuit expanded on this finding in Smith v. Balkcom, 660 F.2d 573 (5th Cir.1981):
“All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated — i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence. The guarantee of impartiality cannot mean that the state has a right to present its case to the jury most likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury most likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury least likely to convict or impose the death penalty, nor that the defense must present its case to the jury least likely to find him innocent or vote for life imprisonment.”
The defendant, Lasseigne, wants us to believe that to be impartial, a jury must be biased in favor of the defense. We do not agree. Both sides are entitled to an impartial jury, neutral as to guilt. This means freedom from bias against the prosecution as well as freedom from bias against the defendant and for the prosecution. Smith v. Balkcom, supra; Spinkellink v. Wainwright, supra. The right of both parties to an impartial trial, and the state’s interest in just and evenhanded application of its law, are too fundamental to risk their loss by impaneling a possibly defendant-prone jury by including those veniremen who have indicated their inability to follow the law on the subject of the death penalty. Smith v. Balkcom, supra; Spinkellink v. Wainwright, supra.
*1102 In the ease presently before the court the transcript of the voir dire examination reveals that those chosen to be jurors indicated no bias for either the prosecution or the defense. None indicated a preconceived opinion as to guilt. Each was comfortable with the presumption of innocence. The chosen jurors indicated that they had no scruples against the death penalty and that they would apply the law as given to them by the judge. Such jurors cannot be considered prosecution prone.
Lasseigne further contends that the exclusion of persons unalterably opposed to the death penalty deprived him of his right to a jury representative of a cross-section of the community. Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) held that “venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.” However, a defendant is not entitled to a jury of any particular composition. Taylor v. Louisiana, supra.
Lasseigne argues that persons opposed to the death penalty make up a distinctive group which may not be excluded from a jury. It may well be true that persons opposed to the death penalty form a distinctive group in the community. The elimination of prospective jurors who are disqualified by an unalterable opposition to the death penalty reduces the possibility of obtaining a jury which is representative of a true cross-section of the community. Smith v. Balkcom, supra.
“Nevertheless it must be remembered that a jury which reflects a fair cross-section of the community is a goal that is never to be achieved at the cost of leaving on the jury those veniremen who are legitimately disqualified. As the Supreme Court has observed, ‘The fair cross-section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury list or panels are representative of the community.’ [Taylor v. Louisiana ], 419 U.S. at 537-38, 95 S.Ct. at 701.” Smith v. Balkcom, supra.
The U.S. Supreme Court has stated that even where a prima facie violation of the fair cross-section is proven, a state may justify the violation upon showing a significant state interest which is “manifestly and primarily” advanced by the jury selection criteria which result in the exclusion of a distinctive group. Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); See also, Smith v. Balkcom, supra.
In light of the right of both parties to a neutral jury, not biased in favor of either side, we believe that the state has shown a sufficiently significant state interest to justify exclusion of those potential jurors unalterably opposed to the death penalty.
“The fair cross-section must, in the end, be fair. Neither the state nor the defendant is entitled to an unfair juror whose interests, biases or prejudices will determine his or her resolution of the issues regardless of the law and regardless of the facts. A cross-section of the fair and impartial is more desirable than a fair cross-section of the prejudiced and biased.” Smith v. Balkcom, supra.
Therefore, we hold that the trial judge properly excluded those jurors who expressed an unalterable opposition to the death penalty.
STATE’S RIGHT TO IMPEACH ITS OWN WITNESS:
The defendant asserts that the trial court erred in allowing the state to impeach its witness, Earline Lasseigne. The state obtained a signed statement from the witness before trial to the effect that the defendant, her ex-husband, told her that he killed Russ Landry. On March 1, 1982, Earline testified at the hearing on defendant’s motion to quash as follows:
“Q. What did he (Carey) say?
A. He said that he killed Russ.”
Again, during the course of the trial, the state called Earline Lasseigne as a witness in its case in chief. Again Earline testified:
“A. He said that he’d kill me like he killed Russ.
*1103 Q. Specifically with reference to Russ Landry, what did he say?
A. That he had killed Russ.”
On cross-examination however, the witness changed her testimony. When asked by defense counsel whether defendant said “I killed Russ” or “We killed Russ” she replied:
“A. I don’t remember.
Q. Huh?
A. I don’t remember.
Q. It could have been ‘we’?
A. I don’t know.”
On re-direct the state questioned Earline as to her prior testimony concerning defendant’s confession to her as opposed to what she was now testifying that he said to her. The defense objected to such questioning arguing that the state was attempting to impeach its own witness. Counsel for the state admitted that he was trying to impeach the witness. A bench conference was held. No further objection was noted on the record. The state continued to question the witness as to prior inconsistent statements.
Generally a party is not allowed to impeach the testimony of his own witness. La.R.S. 15:487 states that:
“No one can impeach his own witness, unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.”
La.R.S. 15:488 explains what is meant by surprise in the previous section.
“ ‘Surprise’ in the sense of the last preceding article does not arise out of the mere failure of the witness to testify as expected, but out of his testifying upon some material matter against the party introducing him and in favor of the other side.”
In State v. Calloway, 324 So.2d 801 (La.1975) the Louisiana Supreme Court held that the standard for surprise was met where: 1) the state proved, outside the presence of the jury, that it had no prior indication that the witness would testify contrary to his prior statement, and 2) the testimony would have been damaging to the state’s case. We hold that the state has met this standard and was therefore, properly allowed to impeach its own witness, Earline Lasseigne. Ms. Lasseigne had previously consistently testified that her ex-husband told her that he had killed Russell Landry. There was no prior indication that he might have said “We killed Russ Landry”. Therefore, the necessity for surprise was met.
In addition, this testimony was potentially harmful to the state. The prosecution was basing its case on statements made by Carey Lasseigne indicating that he alone had committed the crime. On the other hand, Lasseigne’s defense was based on his contention that the actual murder was committed by another, although in his presence. Any testimony indicating the possible involvement of another person would tend to prove the truth of defense’s contention, thereby damaging the state’s case.
Under the circumstances, the state was properly allowed to impeach its witness. INTRODUCTION OF EVIDENCE OF PRIOR ARRESTS:
Finally, the defendant argues that the trial court erred by allowing the state to introduce evidence of an alleged kidnapping of Earline Lasseigne by defendant Carey Lasseigne. The defendant argues that the state was not allowed to introduce evidence of prior arrests and that the state had failed to give notice of its intention to introduce evidence of other crimes.
Defendant testified on direct examination that he had been arrested for kidnapping his ex-wife. The prosecutor was not introducing anything the jury had not already heard, and under statutory provisions, the prosecutor appears to have been entitled to question the witness concerning this matter which had been raised on direct.
“When a person accused, or a husband or wife, becomes a witness, such witness shall be subject to all the rules that apply to other witnesses, and may be cross-ex *1104 amined upon the whole case.” La.R.S. 15:462.
The defendant “opened the door” to this line of inquiry, while testifying on his own behalf. The state had the right to question him with regard to this arrest. While under arrest for kidnapping his ex-wife, the defendant revealed the location of the gun used to murder Russ Landry. The testimony adduced was within the scope of cross-examination because it was relevant to the circumstances surrounding the discovery of the murder weapon. State v. Constantine, 364 So.2d 1011 (La.1978).
Since defendant himself had testified on direct that he had been arrested for kidnapping his ex-wife, the defendant does not appear to have been prejudiced by the prosecution asking the defendant about the alleged kidnapping.
Accordingly, for the above and foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.