342 So.2d 630 (1977)
STATE of Louisiana
v.
Joseph Clayton SEPULVADO.
No. 58471.
Supreme Court of Louisiana.
January 24, 1977.
Rehearing Denied March 2, 1977.[*]
*633 James B. O'Neill, Zwolle, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., James L. Davis, Dist. Atty., E. L. Edwards, Jr., Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
In the early morning hours of June 28, 1975 two officers of the Bossier Parish Sheriff's Department were parked alongside Highway 80. A Chevrolet went by at a slow rate of speed. The officers began to follow the car because their experience indicated that people going that slowly late at night were either drunk or lost.
After following for several miles, they observed the Chevrolet weaving from lane to lane so they ordered the driver, who was accompanied by his wife, to stop. The driver of the car, defendant, was asked to produce his driver's license, but he stated that he did not have it with him. Defendant did not appear to be drunk, but the officers did detect the odor of alcohol on his breath and noticed a pistol in the front seat of the car. The gun was seized by the officers for their protection.
They then called for a report on the gun and learned that the gun was stolen. They also learned that defendant was driving with a revoked license. Defendant was then arrested and handcuffed. Search of his person produced bullets, money and a key to the trunk of the car. When defendant gave the officers permission to open the trunk of his car, he told them they would find two bodies there. A search of the trunk confirmed this fact and defendant and his wife were transported to the parish jail.
According to the State's evidence the defendant, on the night that he was arrested, told sheriff's deputies that earlier that day, June 27, 1975, he and his wife, Oneda, had accompanied James Michael Sepulvado, a cousin of the defendant, and Bonita Knighton in their car, leaving Bossier City. The reason for the trip was to find a suitable place in which to shoot tin cans with the guns they had in their possession.
Upon arrival at a junkyard near Stonewall in DeSoto Parish the couples began drinking beer and shooting tin cans. James Sepulvado, who was then shooting a .38 caliber pistol, turned his gun on the defendant, Joseph Sepulvado, in a menacing manner. The defendant reacted by kicking the gun out of James' hand, and then shot him in the back with his .44 caliber rifle. Bonita reached for the pistol dropped by James, and the defendant then shot her. The incident occurred at about 6:00 p.m. Thereafter defendant hid the bodies in the bushes nearby and he and his wife returned to James' car and drove around for several hours, drinking more beer. At approximately 10:00 p.m. that night, they returned to the junkyard and placed the two bodies in the trunk of the car. They were later apprehended in Bossier Parish.
An indictment by the grand jury of DeSoto Parish filed September 25, 1975 charged in two counts that Joseph Clayton Sepulvado committed first degree murder of James Michael Sepulvado and Bonita Knighton on June 27, 1975, a violation of *634 Article 30 of the Criminal Code. After trial by jury a verdict of guilty was returned on both counts. Defendant was then sentenced to death on both counts.
In his opening statement the District Attorney advised the jury that the prosecution's case was based upon Article 30(4) of the Criminal Code, requiring that the State prove the offender had a specific intent to kill or to inflict great bodily harm upon more then one person.

Assignment 1
Prior to arraignment defendant filed a motion to quash the indictment alleging that the indictment charged two crimes, contrary to the declaration in Article 493 of the Code of Criminal Procedure that "No indictment shall charge more than one offense. . . ." The motion further alleged that the indictment failed to comply with the formalities required for indictments set forth in Articles 462, 464 and 465 of the Code of Criminal Procedure in that the indictment failed to disclose the date of commencement of prosecution.
The trial judge denied the motion to quash. The defense assigns as error that 1) the indictment was fatally defective, for it failed to disclose the date of the commencement of the prosecution; and 2) it contained a joinder of offenses contrary to the procedural law in effect at the time of the offenses.
The claim that the indictment fails to disclose the date of commencement of the prosecution is without merit. The copy of the indictment in the record discloses that it was formally filed by the grand jury on September 25, 1975. A prosecution for an offense punishable by death can only be instituted by a grand jury indictment. La. Const, art. I, § 15; La.Code Crim.Pro. art. 382. The date of institution is the date the indictment is returned by the grand jury in open court. In this case, therefore, the date of commencement of prosecution is September 25, 1975, the filing date shown on the indictment.
To support the claim that the indictment is contrary to the procedural law defendant relies on Article 493 of the Code of Criminal Procedure in effect at the time of the offenses. On June 27, 1975, when this offense occurred, this article provided that "No indictment shall charge more than one offense . . . ." However, the article was amended by Act 528 of 1975 to provide that
"Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial."
Act 528 of 1975, amending Article 493, was signed by the Governor on July 17,1975 and became effective September 12, 1975. As previously noted, the indictment was returned on September 25, 1975, thirteen days after the effective date of the amendment. Because the amending act permitting multiple billing became effective after the date of the crime, the defense contends that to apply its provisions retroactively to him is contrary to the prohibition against ex post facto laws contained in Section 23 of Article I of the Louisiana Constitution of 1974 and Section 9 of Article I of the Constitution of the United States.
The amendment is an ex post facto law, according to the defense, because the amendment "alters the situation of the accused to his disadvantage", a factor found to be characteristic of ex post facto laws in State v. Ferrie, 243 La. 416, 144 So.2d 380 (1962) and State v. Caldwell, 50 La.Ann. 666, 23 So. 869 (1898).
The State's position is that the amended article is procedural in nature and not substantive. Procedural laws, as distinguished from substantive laws, the State contends, can have retroactive effect without offending the ex post facto provisions of the constitutions. And, the indictment having *635 been returned on September 25, 1975, after the effective date of the amendment, the prosecution was properly instituted in accordance with the amendment.
Procedural laws relate exclusively to questions of remedy and, in criminal cases, pertain to the method prescribed for the conduct of the prosecution. Enactments of this nature may regulate the mode of prosecution after their effective date and not offend the prohibition against ex post facto laws, for no one has a vested right in a mere mode of procedure. Todd v. State, 228 Ga. 746, 187 S.E.2d 831 (1972). See also Fithian v. Centanni, 159 La. 831,106 So. 321 (1925).
On the other hand, liability for criminal conduct attaches at the moment that the crime is committed. Therefore, laws passed after the offense may not work to either redefine or increase the severity of punishment for the crime. To do so would impair substantive rights. Such a law would violate the prohibition against ex post facto laws of the Louisiana and the United States Constitutions.
An ex post facto law, by definition, is one which is passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or deed. Black's Law Dictionary 662 (Rev.4th ed. 1968). See also La.Civil Code art. 8.
Certain criteria for determining if a law is ex post facto have been established. The ex post facto prohibition comes into effect when a law makes an act criminal which was innocent when done and punishes such action; or aggravates a crime or makes it greater than when committed; or changes the punishment and inflicts a greater punishment than the law in effect when the crime was committed; or alters the rules of evidence to receive less or different testimony that the law required at the time the offense was committed in order to convict. Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). A fifth category holds that any law is considered ex post facto which is enacted after the offense was committed and which alters the situation of the accused to his disadvantage. Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1882); Payne v. Nash, 327 F.2d 197 (8th Cir. 1964); State v. Ferrie, 243 La. 416, 144 So.2d 380 (1962); 16A C.J.S. Constitutional Law §§ 440-46 (1956).
The problem involved in deciding whether a procedural law is ex post facto was broadly stated by Mr. Justice Stone in Beazell v. Ohio, 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925);
"Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation . . . and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance".
As the issue is viewed in the context of this case the Court must decide whether the statute materially impairs the right of the accused to have the question of his guilt determined according to the law as it was when the offense was committed. At the same time, it must be recognized that the accused is not entitled of right to be tried in the exact mode, in all respects, that may be prescribed for the trial of criminal cases at the time of the commission of the offense for which he is charged. People v. Ward, 50 Cal.2d 702, 328 P.2d 777 (1958), cert, denied, 359 U.S. 945, 79 S.Ct. 730, 3 L.Ed.2d 678 (1959); Todd v. State, 228 Ga. 746, 187 S.E.2d 831 (1972).
In People v. Adams, 274 N.Y. 447, 9 N.E.2d 46 (1937) the New York Court of Appeals was presented with an identical situation. There defendants argued that a new law which permitted several counts within one indictment was an ex post facto law, in that the law in effect at the time of the commission of the offense required that each count appear on a separate indictment. The defendants asserted that they were *636 materially disadvantaged by the cumulative effect of more than one count in the indictment.
Nevertheless, after noting the general definitions of ex post facto laws, the court concluded that:
"The changes involved in the case at bar were merely procedural. They do not make criminal any acts which previously were innocent; nor do they aggravate a crime and make it greater than it was when committed. Nor do they inflict a greater punishment; nor do they provide for conviction on less or different testimony or create presumptions against the defendant. The relators contend that a law is ex post facto if it makes or may make changes which are to the substantial disadvantage of the accused. Perhaps a statute by reason of working a substantial detriment to the accused may be deemed ex post facto although it does not come within the classification outlined in Calder v. Bull [3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798)], but that the statutes involved herein are not of such a nature cannot be doubted."
In the case at bar the indictment was filed after the effective date of the amendment. Defendant was charged with the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. La.Rev.Stat. 14:30(4). Thus, even under the prohibition against more than one count in an indictment, it would have been necessary to allege that the accused had the intent to kill another person, or did in fact do so. Charging the offense in two counts is essentially the same. In either case neither the substantive nor procedural rights of defendant would be affected. His defense would be the same. The rules of evidence are not changed and the penalty remains the same. State v. James, 339 So.2d 741 (La.1976).

Assignments 2 and 3
These assignments pertain to the identical ex post facto issue considered under Assignment 1. Our treatment of the issue there makes further consideration unnecessary.

Assignment 4
A similar indictment, also containing two counts alleging the killing of the same persons, returned by the same grand jury at the same time, charged defendant's wife Oneda Pearl Sepulvado with second degree murder under Article 30.1 of the Criminal Code.
Defendant filed a motion to consolidate the charge against his wife for trial with the charge of first degree murder lodged against him. He argues that the same set of facts could not constitute the basis for two different indictments, one for first degree murder and the other for second degree murder. The lesser charge against his wife indicates, he says, that the grand jury and the district attorney were in possession of evidence favorable to him which was being withheld. When the trial judge denied the motion to consolidate, this assignment of error was filed.
The inference drawn by the defendant from the different indictments returned does not necessarily follow. The grand jury's right to consider mitigating circumstances and other factors permits them to return different indictments in these circumstances. Moreover, defendant has cited no authority which requires that these cases be consolidated for trial. This assignment has no merit.

Assignment 5
Defendant objected to the opening statement of the prosecutor and moved for a mistrial, stating that the extensive reference to the entire body of Article 30 of the Criminal Code and to other statutes, instead of confining that reference to Article 30(4), amounted to an enlargement of the elements of the crime and was argumentative. The trial judge denied the motion for mistrial and refused to admonish the jury.
While the State's argument in this respect did appear to dwell excessively on articles of the Code and legal propositions *637 not particularly relevant, the summary the prosecutor gave of the State's position did clearly point out the nature of the charge and announce that the State was basing its case on the provisions of Article 30(4), the killing of a human being when the offender has a specific intent to kill more than one person. La.Code Crim.Pro. art. 766.
The ruling complained of was not erroneous.

Assignment 6
In his opening statement the prosecutor referred to the fact that defendant admitted he was driving without his driver's license. Defense counsel objected that this was a reference to a confession or inculpatory statement, which was prohibited by Article 767 of the Code of Criminal Procedure. He moved for a mistrial.
Aside from the fact that the trial judge admonished the jury to disregard the prosecutor's statement, defendant's statement that he did not have his driver's license was part of the res gestae. Defendant was, at the time, in the process of transporting the dead bodies of the victims who had recently been killed. Although he was not at the time in the act of killing, his actions were immediate concomitants of those killings part of the same transaction. La.Rev.Stat. 15:448.

Assignment 7
This assignment protests that the opening statement made no reference to the State's obligation to negate the fact that the killings may have been justified, or that the State must prove that there was a specific intent to kill more than one person.
An opening statement by the prosecutor is not required to explain all aspects of the law applicable to the case. Only the nature of the charge and a general statement of the nature of the evidence by which the State expects to prove the charge are required. La.Code Crim.Pro. art. 766. The defense demands would more appropriately be directed to a charge to the jury.

Assignment 8
Over defense objection the prosecutor produced evidence of oral inculpatory statements made by defendant to Officers Padgett and Breedlove. Previously, in answering questions on the predicate, Officer Padgett testified that they could not recall"everything" which was said on that occasion, and the statements which could not be recalled could "possibly" have been exculpatory or explanatory in nature.
In the absence of producing the defendant's statements in their entirety, the defense complains, no part of the statements made on that occasion are admissible. The contention is based on the pronouncement in Section 450 of Title 15 of the Revised Statutes that "Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."
In the recent case of State v. Marmillion, 339 So.2d 788 (La.1976) this Court had occasion to pass upon a similar contention where the witness could not recall everything which was said at the time the inculpatory statement was made. There this Court held:
"It is true that Section 450 of Title 15 of the Revised Statutes mandates that every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.
"Nevertheless, in the absence of proof to the contrary, the fact that the purported statement of the accused as testified to by the investigating officer does not consist of a verbatim reiteration of the conversation between them, due to the witness' inability to recall or other valid explanation, the rights of the accused under Section 450 are not violated. The law does not require the production of nonexistent portions of the confession or portions which cannot be recalled. State v. Domino, 234 La. 950,102 So.2d 227 (1958). *638 See also State v. Odom, 292 So.2d 189 (La.1974); State v. Bickham, 239 La. 1094, 121 So.2d 207 (1960); State v. Kennedy, 232 La. 755, 95 So.2d 301 (1957); State v. Desroches, 48 La.Ann. 428, 19 So. 250 (1896)."
The mere fact that exculpatory statements may "possibly" have been made will not suffice to warrant excluding the evidence of the confession or inculpatory statement in the absence of a showing of prejudice resulting from the officer's inability to recall "everything" that was said.

Assignment 9
Officer Gray of the Bossier Parish Sheriff's department testified on direct examination that, responding to a call, he arrived at the scene of the arrest on Highway 80 at about 3:00 a.m. on June 28, 1975. This was after the arresting officers discovered the bodies in the trunk of the car. After reading the Miranda warnings to defendant, Officer Gray asked defendant to identify the bodies in the trunk of the car. Defendant then freely responded that the male was James Sepulvado, his distant cousin, but he was not sure about the girl's name. Defendant then recited in detail how the killing occurred.
Officer Gray testified he again questioned defendant at the Bossier Parish Courthouse after advising him of his rights. In this interrogation defendant told Gray that after the victims were killed the bodies were concealed in the bushes nearby. He also recounted the events which transpired before the arrests. Gray was then asked if defendants' statements at the courthouse were in accord with what he said previously at the scene of the arrest on Highway 80. When Gray replied "more or less", he was asked to point out the variations. Gray then replied, "He went into more detail about the location, where the murders had been committed."
Defense counsel objected and requested that the court admonish the jury to ignore Gray's characterization of the deaths as "murders". Whereupon the trial judge admonished the jury to ignore the last remark, after which defense counsel moved for a mistrial, which was denied, and the defense objected to the ruling.
Article 771 of the Code of Criminal Procedure, which is applicable to prejudicial remarks of witnesses, grants authority to the judge to grant a mistrial in his discretion if he is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Considering the fact that defendant had related the full details of the killings to Officer Gray, no undue prejudice resulted by referring to the killings as murders. The admonition to disregard the remark satisfied the trial judge that defendant would not be denied a fair trial on that account.

Assignment 10
Officer Gray testified that defendant's wife's clothes worn at the time of arrest were handed to him at the courthouse, and the defense objected that reference to the wife's clothes was immaterial and irrelevant. The argument is also made that this was a tactic to impeach the wife's testimony before she took the stand.
The clothing was relevant and material because the wife was present at the killing and her clothing was stained by the blood of the victims, according to a crime laboratory analysis. Insofar as the defense allegation that this was an attempt to impeach his wife's testimony, it does not appear that she testified.

Assignments 11 and 12
After having testified on direct and crossexamination Officer Vol Dooley's testimony was concluded. Another witness followed him to the witness stand, after which Dooley was recalled by the State. The prosecutor then referred to the fact that Dooley had been asked on cross-examination whether he asked defendant to take a lie detector test after he talked to him about the offense, and if Dooley knew whether lie detector tests were admissible as evidence in court.
*639 Defense counsel objected to the materiality of the question, arguing that lie detector tests were useful in police investigations, and their admissibility in evidence was immaterial. He further objected that the answer required the opinion of a legal expert. In response the prosecutor argued that Dooley had been asked on cross-examination by defense counsel why he did not give defendant a lie detector test, and the purpose of the State's question was to have the witness explain why the test was not given.
Further questioning of Dooley disclosed that he had been a law enforcement officer for 21 years, had been in court often, and had attended seminars, study sessions and lectures concerning the investigation of crimes. He then answered that lie detector tests were not admissible as evidence. This was followed by an explanation that he didn't give the lie detector test because he did not think defendant lied when he said he had killed "these two people." "What about the rest of it?", he was asked. "I think he was lying about . . . ." His reply was interrupted by a defense objection.
On this record, no error is shown by this assignment. The witness was not testifying as a legal expert, but from experience, and his observations concerning the admission of lie detector tests. Cf. La.Rev. Stat. 15:464-67. He was also entitled to explain why he did not give defendant a lie detector test. La.Rev.Stat. 15:281.

Assignment 13
A blackboard was brought into the courtroom during the noon recess for use by the prosecutor in his closing argument. Sketches were drawn on it to illustrate his argument. Defense counsel objected to the use of the blackboard in argument and to the fact that it was prepared during a court recess outside the presence of the jury. He further requested an opportunity to photograph the blackboard for the record. When the judge would not delay the trial for this purpose, he introduced a sketch of the board into evidence.
In the assignment of error and in brief it is argued that the use of the blackboard was highly inflammatory, contained incorrect information designed to mislead the jury, and was overly theatrical.
According to a sketch made by defense counsel, the blackboard contained a reference to the elements of the crime the State must prove to obtain a conviction. In addition, the cloak of innocence which surrounds a person accused of crime is also referred to on the blackboard. This, together with the prosecutor's closing argument in which he referred to the blackboard, contained nothing improper or unduly prejudicial.

Assignment 14
This special charge was requested by the defense for inclusion in the judge's charge to the jury:
"That under the provisions of Article 30, Title 14, Louisiana Revised Statutes of 1950, as amended, which proscribes against the crime of First Degree Murder, the State of Louisiana must prove that the defendant had the specific intent to kill or inflict great bodily harm upon more than one person and that that intent must have existed at the time of the killing of the human being of which the state has so accused him."
The special charge was denied, because it was included in the court's general charge, was not wholly correct and would require explanation. On the question of intent, the court charged the jury as follows:
"I charge you further that an essential element of the offense of First degree murder and Second degree murder is the specific intent to kill or to inflict great bodily harm, and the State must prove beyond a reasonable doubt that the accused had this specific intent; otherwise the accused must be found not guilty of the offense of First degree murder and Second degree murder.
"Specific intent is defined by Louisiana Revised Statutes Title 14, Section 10, as follows:

*640 "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.'
"Specific criminal intent cannot be presumed from the commission of an unlawful act. It is not requisite that it existed for any particular length of time. It is sufficient if it existed at the time of the act. You, the jury, are to decide whether the accused had the specific criminal intent mentioned above. You are entitled to consider all facts and circumstances in evidence in this case to aid you in determining whether the accused had the requisite specific criminal intent that I have already referred to.
"Intent may be proved by circumstantial evidence. Indeed, it can rarely be established by any other means. While witnesses may see and hear and so be able to give direct evidence of what a defendant does or fails to do, of course there can be no eyewitness account of the state of mind with which the acts were done or omitted. But what a defendant does, or fails to do, may indicate intent, or lack of intent, to commit the offense charged."
The ruling of the trial judge was correct.

Assignments 15 and 16
These assignments were reserved by the defendant to the denial of a motion for new trial and a motion to arrest judgments. The motions were based upon the assignments of error already considered and were properly denied.
After the sentences were imposed in this case, the United States Supreme Court declared the mandatory death penalty prescribed by Article 30 of the Criminal Code unconstitutional in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). When the Roberts case was remanded to this Court for further consideration in light of that holding, we construed the case to mean that the conviction could stand but a penalty less than death should be imposed. Accordingly, in a series of cases presenting similar issues we remanded to the trial court with instructions to impose a sentence of imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years. State v. Jenkins, La., 340 So.2d 157 (1976); State v. Davenport, La., 340 So.2d 251 (1976); State v. Skelton, La., 340 So.2d 256 (1976). The same issue is presented here.
Accordingly, for the reasons assigned, the convictions are affirmed, and the case is remanded to the trial court, and the trial court is ordered to sentence defendant Joseph Clayton Sepulvado on each count to imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years.
DIXON, J., concurs, disagreeing with the treatment of Assignment No. 6, but agreeing with the result.
CALOGERO, J., dissents and assigns reasons.
CALOGERO, Justice, dissenting.
On September 25, 1975 defendant Sepulvado was charged with committing "the offense of FIRST DEGREE MURDER violating the provisions of LSA-RS 14:30 in that he committed first degree murder of James Michael Sepulvado" and in a second count with committing "the offense of FIRST DEGREE MURDER violating the provisions of LSA-RS 14:30 in that he committed first degree murder of Bonita Knighton."Immediately thereafter defendant Sepulvado's attorney filed bills of particular in which he attempted to discover which of the five different sections of the first degree murder statute Sepulvado was charged with committing. The state answered those questions six months later, in March of 1976, less than a month before trial, indicating that defendant's charge was based on section four of that statute which makes unlawful the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily *641 harm upon more than one person." It is clear that the mere killing of two persons does not constitute first degree murder under this statute; the killing of two persons would constitute the commission of two second degree murders, violations of R.S. 14:30.1. It is the intent to kill or inflict great bodily harm on more that one person which transforms a killing into murder in the first degree.
The majority holds that the indictment was properly upheld by the trial court because the state's charging of two offenses in one indictment was acceptable under the newly-amended Code of Criminal Procedure Article 493. I agree with the majority's conclusion that the change in Article 493 was procedural and hence could be applied retroactively to crimes committed before the effective date of the change, without violation of the prohibition against ex post facto laws. However, I do not agree with the majority's conclusion that "[c]harging the offense in two counts is essentially the same" as charging the offense in one count. See my dissent in State v. James, 339 So.2d 741 (La.1976). I believe that indictments charging a person with violating R.S. 14:30(4) must specify the single victim of the murder and allege that the killing was done while the accused had the specific intent to kill or to inflict great bodily harm upon more than one person. Here, although the indictment did not so specify, defendant was given notice of the details of the charge through the state's answers to bills of particular. For this reason, I would find no error in what would otherwise have been a defective indictment even under the newly-amended joinder article. State v. James, 305 So.2d 514 (La.1974).
This problem with the indictment, however, is related to the second, and critical problem, in this case: the failure of the trial judge to correctly charge the jury as to intent.
In assignment number fourteen, defendant complains that the trial judge mistakenly and prejudicially failed to give this charge which he specifically requested:
"That under the provisions of Article 30, Title 14, Louisiana Revised Statutes of 1950, as amended, which proscribes against the crime of First Degree Murder, the State of Louisiana must prove that the defendant had the specific intent to kill or inflict great bodily harm upon more than one person and that that intent must have existed at the time of the killing of the human being of which the state has so accused him."
Although the judge did read to the jury the definitions of first and second degree murder, his instructions, which are quoted in the majority opinion, do not distinguish between the intent necessary before finding a person guilty of second degree murder, i. e., "[w]hen the offender has a specific intent to kill or to inflict great bodily harm," and the very much greater intent necessary for first degree murder, i. e., "[w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." [emphasis added] The trial judge specifically instructed the jury that "an essential element of the offense of First degree murder and Second degree murder is the specific intent to kill or to inflict great bodily harm, and the State must prove beyond a reasonable doubt that the accused had this specific intent." The judge's instructions, therefore, did not explain the greatly increased intent necessary in order to be guilty of first degree murder. The judge's refusal, therefore, to give the wholly pertinent and wholly correct instruction requested by defense counsel was clearly error.
Additionally, the error was extremely prejudicial to defendant under the particular facts of these killings. The incident arose as four friends, two of them cousins, were engaged in drinking beer and shooting at tin cans at a local junkyard. According to the defendant's statement related in trial by the state's witness, when the male victim turned his gun on defendant Joseph Sepulvado, Joseph shot and killed him. The victim James Sepulvado's friend Bonita Knighton then reached for James' gun, and Joseph Sepulvado shot and killed her also. Under these circumstances, unless the jury *642 had been convinced that defendant had the specific intent to shoot or kill both victims before he shot the first, or as he shot the first, the jury as a matter of law would have had to have returned a verdict no greater than second degree murder. For this reason, the judge's instructions to the jury as to the difference between the intent required for first degree murder as opposed to second degree was critical. The judge's refusal to incorporate defendant's suggested wholly pertinent and wholly correct charge into his instructions was therefore blatant error, thoroughly prejudicing defendant's case.
For this reason, I dissent.
NOTES
[*] Calogero, J., was of the opinion that a rehearing should be granted.