491 So.2d 1380 (1986)
STATE of Louisiana, Appellee,
v.
Clifford Ray BOWMAN, Appellant.
No. CR85-904.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1986.
Rehearing Denied August 8, 1986.
*1382 Gerald J. Block, Lafayette, for defendant-appellant.
Carol Spell, Jr., Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before FORET, PLANCHARD[*] and McNULTY [*], JJ.
FORET, Judge.
Defendant, Clifford Ray Bowman, was indicted by a grand jury on April 20, 1983, and charged with the first degree murder of his father-in-law, Leland "Whitey" Johnson, on April 10, 1983, a violation of La.R.S. 14:30. Defendant entered a plea of not guilty and not guilty by reason of insanity. A sanity hearing was held on November 9, 1983, and the defendant was found capable to proceed.
On February 26, 1985, prior to the selection of the jury, defendant filed a motion for a hearing on Witherspoon[**] voir dire and for individual and sequestered voir dire, and in the alternative, the selection of two separate juries, challenging the constitutionality of the death qualified jury selection process. The trial court denied the motion and jury selection proceeded.
On March 2, 1985, the jury returned a verdict of guilty of first degree murder. The sentencing hearing began on March 3, 1985, at which time the jury unanimously recommended life imprisonment without benefit of parole, probation, or suspension of sentence. In accordance with the recommendation, defendant was so sentenced on March 8, 1985. Defendant has appealed his conviction and advances twelve assignments of error.

FACTS
After midnight, in the early morning hours of April 10,1983, defendant, Clifford Bowman, drove to his father-in-law's mobile home. Defendant was armed with a Weathersby .300 rifle and fired one shot outside the trailer, broke a window on the locked trailer door, and forced his way into the mobile home. The victim, "Whitey" Johnson, was crouched on the floor attempting to phone the police when the defendant fired a fatal shot to his head. Defendant then fired another shot down the hallway in an apparent attempt to shoot Whitey's nephew, Richard Ross, who also occupied the mobile home. Additionally, defendant's ex-wife, who was also the victim's daughter, Carolyn Merrick, was in the mobile home with their two children. Defendant attempted to shoot his wife, but he had run out of bullets.
Defendant then took a cigarette from the person of the victim and smoked it as he called 911, the emergency phone number. Almost immediately, Officer Mitch Walley arrived on the scene and defendant said, "I cracked, Mitch."
The victim was a building contractor for whom the defendant worked as a carpenter. Richard Ross, the victim's nephew, was also in his employ. Ross testified that there had been an argument or disagreement between defendant and victim on the afternoon before the shooting. Carolyn Merrick testified that she was sleeping at her father's trailer the night of the shooting because she was eight months pregnant and concerned about going into labor, had no transportation, and defendant had not yet come home. Carolyn Merrick also testified that defendant stayed at the scene until he was taken into custody and transported to the sheriff's office.

ASSIGNMENTS OF ERROR 1, 2 & 10
By these assignments, the defendant challenges the fairness and constitutionality of the jury selection process involving cases in which the state seeks to invoke the death penalty for the crime of first degree murder. Defendant argues that such a death qualification process denies him the right to a neutral jury. Defendant offered testimony and exhibits in an effort to establish that the jury selection process results in a jury that is predisposed to conviction, *1383 and is not a fair cross-section of the community.
The most recent U.S. Supreme Court case addressing these issues is Lockhart v. McCree, ____U.S.___,106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In Lockhart, respondent was tried for capital felony murder, convicted, and sentenced to life imprisonment without parole. During voir dire, the judge removed for cause, over respondent's objections, prospective jurors who stated that they would be unable, under any circumstances, to vote for the imposition of the death penalty. Such prospective jurors are named "Witherspoonexcludables."[1]
The court addressed the issue left unresolved by Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968): Whether the constitution prohibits the removal for cause, prior to the guilt-phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors in the sentencing phase of the trial. In a 5-4-1 decision, the U.S. Supreme Court held that it does not.
In the Lockhart case, as in the one before us, the defendant introduced social science studies to support constitutional arguments, establishing that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death-qualified" juries. We believe the data introduced at trial is too tentative to establish such a rule, but will assume, for purposes of this opinion, that the studies are valid and accurate. The U.S. Supreme Court in Lockhart held that: "... nonetheless... the Constitution does not prohibit the States from `death qualifying' juries in capital cases."
The procedure complained of is one authorized by La.C.Cr.P. art. 798 (2), which allows the State to challenge for cause a juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at trial; or that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt. This procedure serves the State's entirely proper interest in obtaining a single jury that can objectively decide all of the issues in defendant's case. Art. 798 is a legislative enactment of Witherspoon v. Illinois, supra.
In State v. Lasseigne, 464 So.2d 1097 (La.App. 3 Cir.1985), writ denied, 468 So.2d 1204 (La.1985), the defendant claimed he was unfairly tried by a "conviction-prone jury" which did not represent a fair cross-section of the community. We upheld the validity of the jury selection process in capital cases quoting from Witherspoon, supra:
"... nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. Nor does the decision in this case affect the validity of any sentence other than one of death. Nor, finally, does today's holding render invalid the conviction, as opposed to the sentence, in this or any other case."
Furthermore, the U.S. Supreme Court in Lockhart stated that the "fair cross-section" principle has never been invoked to invalidate the use of for-cause or peremptory challenges to prospective jurors, or to *1384 require petit jurors as opposed to jury panels or venires, to reflect the composition of the community at large.
"The essence of a `fair cross-section' claim is the systematic exclusion of `a distinctive' group in the community.... In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the `Witherspoon excludables' at issue here, are not `distinctive groups' for fair cross-section purposes."
Lockhart v. McCree, supra.
In State v. Jackson, 450 So.2d 621 (La. 1984), the defendant contended that Witherspoon voir dire created a guilt-prone jury. The court rejected that argument because, as in this case, the state had not exhausted all of its peremptory challenges, and the defendant was insulated from the death penalty because of the jury's verdict. This argument has been consistently rejected by the Louisiana Supreme Court. See State v. Miller, 391 So.2d 1159 (La.1980) and State v. Kelly, 375 So.2d 1344 (La.1979).
In State v. Leslie Lowenfield, ___ So.2d ___ (La.1985) (docket # 85-KA-0255), three jurors were excluded as a result of their opinions about capital punishment. The court rejected the contention that such jury selection process denied the defendant the right to a jury selected from a representative cross section of the community.
A thorough review of the voir dire proceedings reveals that no juror was challenged for cause, on the basis of his opinion on capital punishment, by the State in this case. Consequently, defendant's argument is without merit because he was tried by the same jury that would have tried him even if no "death qualification" procedure had been employed.
A party asserting a constitutional challenge must show that a decision on those grounds is necessary to protect his rights. State v. Cryer, 262 La. 575, 263 So.2d 895 (1972). Because no juror was excluded by the State as a result of the juror's opinion of capital punishment, defendant cannot make such a showing.
Bifurcated juries, one to decide guilt and another to impose punishment, would not have made any difference because there were no Witherspoon excludable jurors in this case. In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court upheld the constitutionality of a capital sentencing plan which provided that the same jury must sit in both phases of a bifurcated capital murder trial.
Defendant additionally contends that the trial court abuses its discretion in a death penalty case when it denies individual and sequestered voir dire. Defendant claims the trial court abused its discretion in failing to sequester accepted jurors during the remaining voir dire. In State v. Wingo, 457 So.2d 1159 (La.1984), the court stated:
"Nevertheless, the conduct of voir dire is a matter entrusted to the sound discretion of the trial court. Absent special circumstances, the trial court does not err in refusing such requests. The fact that defendant's case is capital does not by virtue of that fact alone establish a `special circumstance' requiring a variation from the general rule of trial court discretion." (citations omitted.)
Accordingly, the trial court's refusal to grant defendant's request was not abusive nor prejudicial. In view of the foregoing reasons, these assignments are without merit.

ASSIGNMENT OF ERROR NO. 3
By this assignment of error, defendant contends he was wrongfully denied twelve peremptory challenges and allowed only eight during the jury selection.
When the murder was committed and at the time of the indictment, La.C. Cr.P. art. 799 provided for twelve peremptory challenges in a first degree murder prosecution. Prior to trial, the article was amended, reducing the number of challenges to eight. Acts 1983 No. 495 § 1.[2]
*1385 Defendant claims that retroactive application of the '83 amendment is unconstitutional. However, the record reflects that defendant used only six peremptory challenges. Because he did not exhaust his peremptory challenges before panel completion, he cannot complain of any deprivation. State v. Smith, 430 So.2d 31 (La.1983); State v. Cryer, supra; State v. Sugar, 408 So.2d 1329 (La.1982); LSA-C.Cr.P. art. 800.
Additionally, Art. 799 is not substantive; rather, it is procedural. Methods prescribed for the conduct of trial do not afford prohibition against ex post facto laws, since no one has a vested right in mere mode of procedure. State v. Sepulvado, 342 So.2d 630 (La.1977); State v. Ledet, 458 So.2d 1024 (La.App. 3 Cir.1984), writ denied, 462 So.2d 1263 (La.1985). Consequently, this assignment is without merit.

ASSIGNMENT OF ERROR NO. 4
By this assignment, the defendant contends that the jury erroneously failed to find that he carried his burden of proving legal insanity at the time of the commission of the offense.
Defendant has the burden of proving insanity at the time of the offense by a preponderance of the evidence. La.C.Cr.P. art. 652; State v. Claibon, 395 So.2d 770 (La.1981); State v. Roy, 395 So.2d 664 (La. 1981). The relevant inquiry on appeal is whether defendant adduced evidence of his insanity at the time of the commission of the offense such that any rational trier of fact could have concluded that he carried the burden of proving his insanity by a preponderance of the evidence. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Guidry, 450 So.2d 50 (La.App. 3 Cir.1984).
Defendant's burden is to prove a mental disease or defect which would render him incapable of distinguishing right from wrong with reference to the conduct in question. La.R.S. 14:14; State v. Roy, supra.
Defendant introduced medical records of previous hospital admissions. Defendant underwent psychiatric treatment in such facilities many times since his first hospitalization in West Germany in 1975, while in the army. Defendant has been diagnosed as a paranoid schizophrenic. Four of the hospitalizations were for two to four-week periods at six to eight-month intervals. Defendant's last hospitalization was in November, 1981. Defendant was an outpatient at several psychiatric treatment centers in Louisiana.
Three experts, including two psychiatrists and one psychologist, testified that they diagnosed defendant as a paranoid schizophrenic. All three experts testified that it was highly probable that defendant was unable to distinguish between right and wrong when committing the crime. The psychologist, testifying at trial, stated for the record several of defendant's answers to the Minnesota Multiphasic Personality Inventory Test (MMPII). Defendant answered several true/false questions on the MMPII test as follows:
"Q. Would you read that again more carefully, sir.
A: I think most peopleOh, I'm sorrywould lie to get ahead.
Q: He says true to that?
A: He says that's true.
Q: Question number 316, sir?
A: 316. (reading) I think nearly everyone would tell a lie to keep out of trouble.
Q: What's the answer, sir?
A: True.
Q: Number 475.
A: When I'm cornered, I tell that portion of the truth which is not likely to hurt me and he says true.
* * * * * *
Q: If you could look at question number 289 for me.
A: (reading) I'm always disgusted with the law when a criminal is freed *1386 through the arguments of a smart lawyer.
Q: Answer, sir?
A: False.
The above questions and responses were not significant to the testifying psychologist, but were apparently significant to the triers of fact.
Defendant contends that crucial lay testimony was given by Jerry Grogg. Mr. Grogg testified that defendant acted strangely the day before the murder and kept telling him, "We need to talk", but would not talk. Defendant alarmed Grogg when he appeared armed with a rifle at a construction site. According to Grogg, defendant spoke with young ladies at lunch and wanted to play pool. He also testified that defendant appeared very nervous, perspired heavily, had puffy eyes, and requested a drink. Grogg's characterization of defendant ranges from normal to bizarre.
Without going into extreme detail, we will note the evidence which contradicts defendant's contention of legal insanity at the time of the offense. Several of the lay witnesses for the State testified as to their observations of the defendant up to the time of the shooting. Richard Ross attested to the fact that defendant often drank large quantities of liquor and became violent when drinking. Defendant's truck was found to contain several empty gin bottles when searched at the scene of the crime.
The record reveals that defendant was emotionally upset and angry in the few hours before the murder. Defendant's sisters testified that he called each of them and that he was drinking gin and playing with his gun while speaking with them on the phone. It is obvious, from the testimony adduced at trial, that defendant and the victim had a number of arguments during the preceding weeks and that defendant was irate and jealous because his father-in-law was supporting his wife and children.
The most damaging testimony presented was by James Dooley, defendant's brother-in-law. Dooley testified that while on a hunting trip with defendant five months before the shooting, defendant had expressed his anger and resentment toward Whitey and said that if Whitey "gypped" him again he would kill him. Defendant told Dooley that because he (defendant) had been to a mental institution, he could "get away with murder" claiming flashbacks and other mental problems. Defendant's first words to the arresting officer Mitch Walley were, "I cracked, Mitch."
Considering the evidence summarized above, a rational jury could have concluded that defendant was able to distinguish between right and wrong and deliberately planned to kill the occupants of the trailer, thinking he could rely on an insanity defense because of his medical history. Consequently, a rational jury could have been unconvinced by the expert testimony and found that the defendant had unsuccessfully rebutted the presumption that he was sane at the time of the offense. La.C. Cr.P. art. 821; State v. Korman, 439 So.2d 1099 (La.App. 1 Cir.1983). Consequently, this assignment has no merit.

ASSIGNMENT OF ERROR NO. 5
Defendant claims prejudicial error in the introduction into evidence of a blood-stained t-shirt belonging to the victim.
Applying the standard applicable to the introduction of gruesome photographs, as the defendant submits should be done here, the trial court committed no error in allowing the introduction of the shirt. The test of admissibility of allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury. State v. Gaskin, 412 So.2d 1007 (La.1982).
Unlike a photograph depicting a bloody body, a blood-stained t-shirt, while unpleasant, is not particularly gruesome. Furthermore, the shirt was admitted for the purpose of showing the violent nature of the victim's death.
Defendant argues that the shirt was only of limited probative value since the defense stipulated that the victim's death was caused by a gunshot wound to the head fired by defendant. A defense stipulation *1387 to the fact and cause of death necessarily bears upon balancing the probative value of evidence such as this against its prejudicial value, but the decision remains one for the trial court. State v. Gilmore, 332 So.2d 789 (La.1976). In Gilmore, the Louisiana Supreme Court relied on Wigmore's treatise on evidence in holding that a defendant may not always be permitted to rob the state's evidence of its fair and legitimate weight by means of a stipulation. Wigmore's solution to the question was to leave the issue of admissibility to the trial judge.
Considering that the defense stipulation was to the cause of death and not necessarily the violent nature of the killing, and the fact that a bloody t-shirt is not overly gruesome, the trial court did not abuse its discretion in allowing the shirt into evidence. Furthermore, although the t-shirt was admitted into evidence, it was not displayed to the jury. Hence, the admission of the t-shirt was not so prejudicial as the defendant contends. Consequently, this assignment is without merit.

ASSIGNMENTS OF ERROR NO. 6 and 7
The defendant assigns as prejudicial error the trial court's refusal to allow hearsay testimony by defense witness, Bonnie Lewis (which the defendant contends was properly elicited) in an effort to impeach Carolyn Merrick, defendant's former wife and victim's daughter, by prior inconsistent statements.
Specifically, defendant claims that during the cross-examination of State's witness, Carolyn Merrick, Merrick denied telling Bonnie Lewis that she had to explain to defendant what had occurred on the night the defendant shot her father. Defendant sought to impeach Merrick by eliciting hearsay testimony from Ms. Lewis who, defendant contends, would have stated that Merrick had in fact told her a prior inconsistent statement. The statement consisted of the following: that Merrick said she did have to tell her husband what took place the night of the shooting.
Evidence of a prior inconsistent statement can be used for impeachment purposes. State v. Mosely, 360 So.2d 844 (La.1978). The use of such a prior inconsistent statement is available only when the foundation requirements of R.S. 15:493 have been met.[3]State v. Thibodeaux, 380 So.2d 59 (La.1980). The requirement for a proper foundation is to be strictly applied. The witness to be impeached must first have his attention called to the particular time, place, and circumstances of the alleged statements. State v. West, 437 So.2d 256 (La.1983).
The trial judge in the instant case ruled the statement inadmissible, finding that the defense had not laid the proper foundation. A transcription of the pertinent part of the cross-examination of Carolyn Merrick is as follows:
"Q Okay, Carolyn. Did you ever talk to Bonnie Lewis, one of Cliff's sisters, after the shooting, on the telephone?
A Yes.
Q Was this shortly after the shooting?
A I know that they came to my house. I don't remember a whole lot back then.
Q You don't remember talking to her on the telephone?
A I honestly can't remember.
Q Do you ever remember whether or not you informed Bonnie Lewis that you had to explain to Cliff what had happened the night that your father was killed?
A That I had to explain to him?
Q Yes.
A No.
Q You never told her that?

*1388 A No. I didn't see him after that.
Q You talked with him on the phone, didn't you?
A The next day?
Q Yes.
A Yes."
As is apparent from the above quoted cross-examination, Ms. Merrick's attention was not specifically called to the time and place of the alleged inconsistent statement. It is not clear from the questioning whether she was asked if she made the specific statement on the telephone or in person on the day of or the day after the shooting. In State v. Savoie, 448 So.2d 129, 133 (La.App. 1 Cir.1984), the court stated:
"The party seeking to use the statement must first comply strictly with the requirements of LSA-R.S. 15:493 to avoid surprise and allow the witness to explain the inconsistency. State v. West, 437 So.2d 256 (La.1983). The rationale for such a strict foundation is to obviate surprise and to let the witness either deny or explain the inconsistency. State v. Heard, 408 So.2d 1247 (La.1982)."
In that case, the state laid the impeachment foundation by asking the witness if he had made the statement and to describe the circumstances surrounding the taking of the statement. The court upheld such a procedure. However, such was not the case with Merrick and as the law requires strict compliance with La.R.S. 15:493, the trial court did not err in finding that a sufficient foundation had not been laid to elicit impeachment testimony.

ASSIGNMENT OF ERROR NO. 8
By this assignment, defendant contends the trial court erred in refusing to allow one of the defense expert witnesses, Dr. Regan, to be present during the testimony of another defense expert witness, Dr. Rees. La.C.Cr.P. art. 764 authorizes the exclusion of witnesses during the proceedings.
Under this article governing sequestration of witnesses, the trial judge has no discretion when an order of sequestration is requested, either by the state or defendant, but must grant the order subject only to his power to modify it at the time it is granted or thereafter, in the interest of justice. State v. Johnson, 438 So.2d 1091 (La.1983).
The State did ask for an order of sequestration, and the defendant shows no interest of justice being served by exempting Dr. Regan from this rule. Consequently, this assignment is without merit.

ASSIGNMENT OF ERROR NO. 9
During voir dire examination of prospective jurors, the defense requested that the court allow examination of one of the jurors, Ms. Thibodeaux, out of the presence of the other jurors. The request was denied and the defendant assigns this denial as error.
During the course of voir dire, Ms. Thibodeaux stated she knew one of the defense witnesses, Keith Wingate, and admitted she neither trusted nor respected him and that her opinion of him would influence her opinion of that witness' credibility, and she would tend not to believe him. The examination of Ms. Thibodeaux took place on February 26, 1985. Throughout that day, as well as the next, no jurors were questioned as to how any statements of Ms. Thibodeaux, with respect to the witness' credibility would affect them. The defense does not show that any of the jurors were at all influenced by the answers of Ms. Thibodeaux.
Not until the next day, February 27, 1985, did the defense request Ms. Thibodeaux be examined out of the presence of the venire. This was long after Ms. Thibodeaux first expressed her opinion of Wingate's credibility. On February 27, the only question asked of Ms. Thibodeaux with respect to this witness was whether her opinion of Wingate's credibility would influence her belief of other defense witnesses, to which Ms. Thibodeaux stated it would not. This statement, made after defendant had requested her individual examination, can hardly be said to be prejudicial.
The conduct of voir dire examination is left largely to the discretion of the *1389 trial judge. State v. Wingo, supra; State v. Monk, 454 So.2d 421 (La.App. 3 Cir.1984), writ denied, 459 So.2d 537 (La.1984). Absent special circumstances, the trial court does not err in refusing requests for individual voir dire such as in this case. State v. Wingo, supra. The defendant does not establish any such special circumstance. Unless there exists a significant possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material, there is no requirement that a juror be examined individually. State v. Monk, supra. The record does not establish any prejudice in the present case since the defendant cannot show, as he claims, how other jurors were influenced by Ms. Thibodeaux's opinion. Consequently, this assignment is without merit.

ASSIGNMENT OF ERROR NO. 11
By this assignment, defendant claims the trial court erroneously ruled with respect to defendant's challenge for cause of prospective juror, Mr. Broussard. The grounds for defendant's challenge was Mr. Broussard's statement that the defense of insanity was used and abused too frequently and unnecessarily.
The trial court questioned Mr. Broussard, after the defense challenged for cause, and sufficiently rehabilitated the juror. Mr. Broussard told the court unequivocally that he would apply the law, with respect to the burden of proof of insanity, as the court directed. The defense then excused Broussard with a peremptory challenge.
In any event, defendant cannot show any reversible error with regard to the trial judge's denial of the challenge for cause as the defendant had not exhausted all of his peremptory challenges before the completion of the jury panel. State v. Sugar, supra; State v. Williams, 447 So.2d 495 (La.App. 3 Cir.1984), writ denied, 450 So.2d 969 (La.1984). Defendant exercised only six peremptory challenges. This assignment is without merit.

ASSIGNMENT OF ERROR NO. 12
In this final assignment of error, defendant requests that the court inspect the pleadings and proceedings in this matter for errors patent.
La.C.Cr.P. art. 920 places errors patent within the scope of appellate review even absent any assignment of such error. Accordingly, a thorough examination of the pleadings and proceedings reveals no errors patent.
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] Judge Arthur J. Planchard, of the 14th Judicial District Court, and Judge Michael J. McNulty, of the 16th Judicial District Court, participated in this opinion by appointment of the Louisiana Supreme Court as Judges Pro Tempore.
[**] Discussed post at page 1383.
[1] "Witherspoon -excludable" is not an accurate term because in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the court held that the proper constitutional standard is simply whether a prospective juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Id., at 850, quoting Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).
[2] Since the time of this trial, the article was again amended during the 1985 legislative session, to provide for twelve peremptory challenges in a first degree murder case. Acts 1985 No. 952 § 1.
[3] La.R.S. 15:493 provides that when the credibility of a witness will be impeached by proof of any statement made by him which is contradictory to his testimony, he must first be asked whether he has made the statement, call his attention to the time and place and circumstances, and to whom the alleged statement was made in order that the witness can explain that which is prima facie contradictory. If the witness does not distinctly admit making the statement, evidence that he did make it is admissible.