505 So.2d 256 (1987)
STATE of Louisiana, Plaintiff-Appellee,
v.
John STANDRIDGE, Defendant-Appellant.
No. CR 86-1257.
Court of Appeal of Louisiana, Third Circuit.
April 8, 1987.
Writ Denied June 19, 1987.
*257 Raleigh L. Ohlmeyer, Jr., Louis A. Heyd, Jr., New Orleans, for defendant-appellant.
Carrol Spell, Jr., Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before FORET, DOUCET and KNOLL, JJ.
KNOLL, Judge.
Defendant was charged with theft of cash in excess of $500, a violation of LSA-R.S. 14:67, and filed a written plea of not guilty and not guilty by reason of insanity. After waiving his right to trial by jury, defendant was found guilty as charged, and sentenced to serve two years with the Department of Corrections, suspended on the condition that defendant make restitution of $50,000. Defendant now appeals contending that the trial court's finding that he was sane at the time of the commission of the offense was contrary to the law and evidence.

FACTS
In January 1983 D.W. MacDiarmid, the victim, retained defendant, a licensed Louisiana attorney, to represent him in connection with his financial involvement in a failing Lafayette night club. As part of his representation defendant was entrusted in February 1983 with $76,000 to invest in annuities for MacDiarmid. Between February and June 1983 defendant never invested the $76,000 as envisioned by the MacDairmids, and the money was never found. On May 23, 1983, defendant voluntarily committed himself to DePaul Mental *258 Hospital in New Orleans where he remained until June 18, 1983 and was diagnosed as having a generalized anxiety disorder with depression. Subsequently, from February 2, 1984, through May 31, 1984, defendant was committed by the Orleans Criminal District Court for incapacity to stand trial (on charges not related to this appeal) because of manic depressive psychosis. At the time of trial defendant was receiving 3000 mg. of Lithium and was able to maintain a law clerk position with the Orleans Parish Criminal Court.

INSANITY DEFENSE
Defendant contends that the trial judge's finding that he was sane when he misappropriated MacDiarmid's funds is contrary to the law and evidence. In particular, defendant argues that the trial court: (1) disregarded all of the expert psychiatric testimony; and (2) placed a burden of proof on defendant to prove his insanity stricter than Louisiana's statutory and jurisprudential law requires.
There is a legal presumption in Louisiana law that a defendant is sane and responsible for his actions. LSA-R.S. 15:432. If the insanity defense is invoked, the defendant has the burden of establishing by a preponderance of the evidence that he was insane at the time of the offense. LSA-C.Cr.P. Art. 652. Furthermore, the defendant must show that he suffered from a mental disease or defect which rendered him incapable of distinguishing right from wrong with reference to the criminal conduct in question. LSA-R.S. 14:14; State v. Smith, 461 So.2d 1155 (La.App.3rd Cir.1984). On appeal, the relevant inquiry is whether any rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could find beyond a reasonable doubt that the defendant failed to prove his insanity by a preponderance of the evidence. State v. Brogdon, 426 So.2d 158 (La.1983), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). Moreover, this determination is made after reviewing all the evidence contained in the record, including expert and lay testimony. State v. Mire, 492 So.2d 180 (La.App.3d Cir.1986), writ denied, 496 So.2d 347 (La.1986). See also Moore v. Duckworth, 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979).
Defendant offered the testimony of two psychiatric experts in support of his insanity defense. The State relied solely on lay testimony.
Dr. Kenneth Ritter, who examined defendant in July 1983, diagnosed defendant as a manic depressant and opined that defendant did not know the difference between right and wrong from February to June of 1983. He further stated that it would be difficult to feign manic depression because the extremely high dosages of lithium now given to defendant would be toxic to a normal person.
Dr. Aris Cox, a psychiatrist, treated defendant for the three months in 1984 when defendant was committed to the Feliciana Forensic Facility. He diagnosed defendant as a manic depressant, a condition he described as mood swings from depression to periods of hyperactivity, euphoria, and elation filled with grandiose ideas. He characterized defendant's actions in the early months of 1983, i.e., taking flying lessons, handling legal matters from many jurisdictions, buying a new car, and committing financial indiscretions, as being consistent with behavior of a manic depressant. Finally he concluded defendant could not distinguish between right and wrong when he diverted money from MacDiarmid.
In summarizing the lay testimony the learned trial judge stated:
"[T]he ultimate issue before this Court is whether or not the defendant, at the time of the commission of the offense of theft was so out of touch with, or in fact out of touch with reality so as that his judgment was impaired, that he was unable to distinguish the difference between right and wrong. In order to assess the defendant's capabilities and in order to reach the answer to that question proposed to this Court, it is necessary to review the testimony of the witnesses who came before the Court. The first witness was Steve MacDiarmid, the son of Mr. MacDiarmid. He had been a lifelong *259 friend, a high school friend, debated in high school with the defendant and he was well acquainted with him, although he had not seen him for a few years following graduation from U.S.L. He said that he met the defendant at a lounge in Lafayette. They exchanged words, and they talked and engaged in social amenities and the issue came up of the representation of his father in a legal problem his father was experiencing. Mr. MacDiarmid testified that at no time during his conversations with the defendant, did he observe any behavior that one might assess as being bizarre, peculiar or out of the ordinary. He said the defendant presented himself with a competent air, an air of confidence, an air of one's desire to be of service to the MacDiarmids and to assist them in solving their legal problems. What Steve MacDiarmid described to this Court is a picture of a competent, conscientious attorney. Mr. MacDiarmid, the father of Mr. Steve MacDiarmid, then testified that he had met with the defendant on at least ten (10) occasions. That the defendant was always punctual, that he discussed the problems with the MacDiarmids. The MacDiarmids indicated they were having financial difficulties and if they could protect their assets, they wished to do so, but they had no urgethat they did not wish to do anything that was against the law. In light of that, the defendant assured them that the plan of action which he had in mind would be fully legal and there would not be any jeopardy. Pursuant to that, the defendant then called upon Mr. Olson who is a person who deals in insurance or methods wherein people can invest in annuities, etc. Mr. Olson accompanied the defendant to the residence of the MacDiarmids, as did the defendant's law partner whose specific duty was to be to handle the bankruptcy of the MacDiarmids. The fact that the defendant was always punctual, that he articulated in a fashion that was reasonable and sensible on these ten (10) occasions, the fact that he brought two (2) other legal professionals, with him to assist in this endeavor indicates to the Court that the defendant at this time was not out of touch with reality. He knew that there was a problem, a legal problem the MacDiarmids were facing. He had a plan of action to solve those problems and he put into motion what he considered to be the manner in which it should be dealt with. Now, what is interesting is that although his law partner was called to testify, Mr. Olson was not called on behalf of the defense. It would have been interesting to see what Mr. Olson had to say. What the law partner said, a young lawyer, was that he never observed the defendant having a problem in determining the difference between right and wrong. He said that the defendant, in fact, continued the practice of law and he was involved in litigation. He said, in fact, that the defendant contacted a client in Arkansas and, in fact, had flown to Arkansas, and this was not a fictitious client, this was a real client who wanted the representation or sought representation of the defendant. That there were other cases in which the defendant represented people outside the area of New Orleans. It is a very common thing. Attorneys are not restricted by law or otherwise from practicing in any area of the State of Louisiana. It is quite a common practice to associate attorneys from other states to assist in litigation. Attorneys can have clients in Hawaii if they want to. Basically, from the time that this defendant sought to represent the MacDiarmids until the time of his breakdown wherein he was committed to DePaul's there is not one iota of evidence from any of the witnesses who testified that the defendant's demeanor was such that he appeared or gave any appearance whatsoever of being out of touch with reality. [Patrick T.] Phillpott testified on behalf of the defense. That he had maintained a very close friendship with the defendant. He also said that in December of 1982, his visits with the defendant were very sporadic, he didn't see him on a day to day basis. He thought the defendant had delusions of grandeur because he took flying lessons and because he attempted *260 to represent people outside the State of Louisiana. When pressed as to whether or not the defendant was actually doing his business, going to work, closing cases and whether or not the defendant was actually making money in the practice of law, Phillpott said he was. Phillpott testified that the defendant had a great appreciation of what the difference was between right and wrong. He conceded that the defendant taught the law of ethics to other aspiring professionals at a university in New Orleans. He testified that he himself, a good friend of the defendant, had never observed the defendant's [sic] departing from the standards of knowing the difference between right and wrong, the standards of postulating the truth until the defendant had a total breakdown and was admitted to DePaul's which, incidentally followed within two (2) or three (3) days of the discovery that funds he had obtained from the MacDiarmids were either no longer in existence or were in jeopardy, and had not been appropriated for the use and desired intent by the MacDiarmids and by the defendant at the time of the theft. All of the lay testimony in this case, all of the witnesses, all of the people who had the opportunity to observe the defendant on a frequent basis, each and every one testified and managed to convey to this Court that the defendant, although he had been predisposed to be a manic depressive was, in fact, functioning well within reality, well, well, within the reach of reality and in touch with that same concept."
The critical inquiry in assessing the insanity defense is whether defendant could distinguish right from wrong at the time of the offense. In this regard the trial court placed greater emphasis on the testimony of individuals who were with defendant during the months when this crime was perpetrated than the opinions of the psychiatrists who did not see defendant until after the crime was committed, based their opinions almost solely on the history given by defendant and failed to interview even the victims of the crime. This analysis neither supports defendant's contention that the trial court disregarded the psychiatric testimony nor held defendant to a greater burden of proving his insanity. Moreover, considering the lay testimony a rational trier of fact could have concluded defendant could distinguish between right and wrong when he misappropriated MacDiarmid's money over a period of several months. Consequently, a rational trier of fact could have been unconvinced by the expert testimony and found that defendant failed to rebut the presumption that he was sane at the time of the offense. State v. Bowman, 491 So.2d 1380 (La.App.3d Cir. 1986), writ denied, 498 So.2d 13 (La. 1986).

DECREE
For the foregoing reasons, defendant's conviction and sentence is affirmed.
AFFIRMED.